STATE OF NORTH CAROLINA v. BRYAN CHRISTOPHER BELL

No. 86A02

(Filed 7 October 2004)

## 1. Jury— peremptory challenges—racial discrimination

The trial court did not violate defendant's constitutional right to a jury of his peers in a first-degree murder, first-degree kidnapping, and burning of personal property case by allegedly allowing the State to use its peremptory challenges to dismiss jurors on the basis of their race, because: (1) the State accepted some jurors of the challenged minority race and the State did not use all of its peremptory challenges; and (2) the State enumerated specific reasons for exercising peremptory challenges against dismissed jurors each time defendant asserted a *Batson* objection including that three prospective jurors were opposed to the death penalty; another might have shown concern or undue sympathy towards defendant based on defendant's similar situation with the prospective juror's foster child; another prospective juror was pregnant, seemed unhappy to be there and inattentive at times, and also had a brother who had recently been prosecuted for stealing by the same district attorney's office prosecuting defendant's case; another prospective juror might have show concern or undue sympathy towards defendant based on her prison ministry work, her position as chairperson of Alcoholics Anonymous, and the personal problems she was having with her daughter; another prospective juror suffered from rheumatoid arthritis and on any given day could suffer so much

1

**STATE v. BELL**

[359 N.C. 1 (2004)]

pain that she would be unable to participate in the proceedings; another prospective juror might have shown undue sympathy based on the fact that she had a child with special needs and also she had been charged with a crime of fraud or dishonesty; and another prospective juror might have shown undue sympathy based on the fact that he also had a child with substance abuse issues and he worked in the mental health field.

## 2. Criminal Law— joinder—trials—motion to sever

The trial court did not violate defendant's rights to a fair trial and due process of law in a first-degree murder, first-degree kidnapping, and burning of personal property case by joining the trials of defendant and a codefendant and by denying defendant's motion to sever the trials, because: (1) defendant and a codefendant were each charged with accountability for first-degree murder, first-degree kidnapping, and burning of personal property; (2) the charges arose from the same series of events involving the same victim and witnesses, and the evidence tended to indicate a common scheme; (3) although defendant contends he was prejudiced by the introduction of a cloth found in the victim's car which contained the codefendant's semen, the testimony of the State's main witness and also from a medical examiner that no sexual assault occurred, coupled with the trial court's limiting instruction that the evidence was to be considered only for purposes of identification and corroboration, was sufficient to safeguard against the jury's misuse of the State's evidence against defendant; (4) if elimination of a desirable juror were a reason for severance, joinder would never occur; and (5) although defendant contends that the codefendant's alibi evidence and jury arguments prejudiced defendant, a solid case was presented against both defendant and the codefendant.

## 3. Jury— random jury selection—specific jury panel

Although defendant contends the trial court violated the requirement for random jury selection in a first-degree murder, first-degree kidnapping, and burning of personal property case by placing certain prospective jurors in specific jury panels, this assignment of error is dismissed because: (1) defendant never made a challenge to the jury selection process in accordance with N.C.G.S. § 15A-1211(c); (2) defendant requested that two of the three remaining jurors, about whom he now objects, be assigned to the last panel; and (3) defendant approved the jury panel at the conclusion of jury selection.

**STATE v. BELL**

[359 N.C. 1 (2004)]

**4. Criminal Law— prosecutor's argument—he who hunts with pack is responsible for the kill**

The trial court did not abuse its discretion in a first-degree murder, first-degree kidnapping, and burning of personal property case by allowing the prosecutor to state during closing arguments that "he who hunts with the pack is responsible for the kill," because the prosecutor was employing the use of an analogy to aid in explaining the complex legal theory of acting in concert.

**5. Criminal Law— prosecutor's argument—if trying the devil, you go to hell to get witnesses**

The trial court did not abuse its discretion in a first-degree murder, first-degree kidnapping, and burning of personal property case by allowing the prosecutor to state during closing arguments that "if you are going to try the devil, you have to go to hell to get your witnesses," because: (1) the prosecutor made this statement in response to a direct attack by defendant on the credibility of the State's star witness; (2) the prosecutor defended the witness's credibility to the extent that one can defend the credibility of a participant in the crime; and (3) our courts have previously considered and approved use of the phrase to which defendant objects.

**6. Criminal Law— appellate review—statements by trial court—absence of objections—plain error inapplicable**

Statements made by the trial court regarding appellate review when explaining the function of the court reporter, when informing a prospective juror to speak audibly in order for the court reporter to record her responses, and when explaining the importance of court reporters in honor of National Court Reporter Day during a break in the trial will not be reviewed on appeal because defendant did not object to the statements at the time they were made, and the statements did not constitute jury instructions and thus do not fall within the purview of plain error.

**7. Kidnapping— first-degree—motion to dismiss—sufficiency of evidence**

The State's evidence was sufficient for submission of a charge of first-degree kidnapping to the jury under the alternative theories alleged in the indictment because: (1) substantial evidence was presented by the State that defendant intended to steal the victim's car and that he kidnapped the victim to facilitate the

STATE v. BELL

[359 N.C. 1 (2004)]

theft; (2) substantial evidence was presented that defendant continued to confine the victim in order to facilitate his repeated assaults upon her with a deadly weapon; (3) substantial evidence was presented that defendant confined the victim in order to facilitate the burning of her personal property; (4) while it may have been unnecessary to confine, restrain, or remove the victim in order to accomplish any of defendant's crimes, substantial evidence was presented that defendant did, in fact, make the decision to confine, restrain, and remove the victim in order to facilitate larceny of a motor vehicle, assault with a deadly weapon, and burning of personal property; and (5) substantial evidence was presented that defendant's actions were meant to terrorize the victim.

**8. Appeal and Error— preservation of issues—failure to object—failure to assert plain error**

Although defendant contends the trial court erred by allowing a prior statement of a witness into evidence for the purpose of corroborating his trial testimony, this assignment of error is dismissed because: (1) defendant never separately objected or joined in a codefendant's objection, thereby waiving his right to appellate review; and (2) defendant failed to specifically assert plain error. N.C. R. App. P. 10(b)(1), 10(c)(4).

**9. Appeal and Error— preservation of issues—failure to object—failure to assign error**

Although defendant contends the trial court violated double jeopardy principles by submitting the charges of first-degree murder and first-degree kidnapping based on the victim having been seriously injured, this assignment of error is dismissed, because: (1) defendant failed to object to submission of these charges at trial; and (2) not only did defendant fail to raise the issue at trial, but he also failed to properly raise double jeopardy in his assignments of error.

**10. Kidnapping— first-degree—disjunctive instructions**

The trial court did not err by giving a disjunctive first-degree kidnapping instruction to the jury and by submitting a verdict form which did not require the jury to be unanimous as to the purpose for which the victim was kidnapped, because: (1) N.C.G.S. § 14-39(a) provides numerous routes by which a defendant may be convicted of first-degree kidnapping, but ultimately, a defendant can only be found guilty and punished once; (2) if the

**STATE v. BELL**

[359 N.C. 1 (2004)]

trial court merely instructs the jury disjunctively as to various alternative acts which will establish an element of the offense, the requirement of unanimity is satisfied; and (3) it is not necessary for the State to prove, nor for the jury to find, that a defendant committed a particular act other than that of confining, restraining, or removing the victim.

**11. Sentencing— aggravating circumstances—pecuniary gain—no double counting—no plain error**

The trial court did not err by submitting the N.C.G.S. § 15A-2000(e)(6) aggravating circumstance that a first-degree murder was committed for pecuniary gain where (1) in response to defendant's concerns of double counting, the court limited evidence supporting the pecuniary gain aggravating circumstance to evidence that money was taken from the victim's purse and limited the evidence to support the aggravating circumstance that the murder was committed during the commission of a kidnapping to evidence that defendant kidnapped the victim to facilitate larceny of her car, and (2) there was sufficient evidence to support submission of the pecuniary gain aggravating circumstance based on defendant's theft of money from the victim's purse. Furthermore, the instruction given by the trial court on the pecuniary gain aggravating circumstance did not constitute plain error where defendant actually supplied the trial court with the language it used to instruct the jury on this aggravating circumstance, and there was no reasonable probability that the result would have been different had error in the instruction, if any, not occurred.

**12. Evidence— testimonial statement—unavailable witness—absence of cross-examination—harmless error**

Although the trial court erred in a capital sentencing proceeding by overruling defendant's objection to the admission of a robbery victim's testimonial statement to a police officer that defendant had robbed him and cut him with a knife which was introduced to show the aggravating circumstance that defendant committed a prior violent felony when the victim was not found to be unavailable and had never been subjected to cross-examination by defendant, this error was harmless beyond a reasonable doubt because defendant's guilty plea to common law robbery was an admission of the commission of a felony involving the use or threat of violence even without the erroneous admission of the victim's statement.

**13. Sentencing— mitigating circumstances—no significant prior criminal history**

The trial court did not err in a first-degree murder sentencing proceeding by overruling defendant's objection to the submission of the N.C.G.S. § 15A-2000(f)(1) statutory mitigating circumstance that he had no significant prior criminal history, because: (1) most of defendant's prior convictions were crimes against property; (2) defendant had been convicted of common law robbery but had not repeatedly engaged in threatening or violent behavior beyond that one conviction; (3) defendant's convictions for use of drugs and alcohol, while prior convictions, were not significant enough to keep this mitigating circumstance from the jury and these same convictions were used to support two other mitigating circumstances; (4) defendant received no active prison time for any of his prior convictions, and although defendant's history was fairly recent, numerous mitigating circumstances based on his age and family history were presented for the jury to consider when viewing his criminal history; (5) absent extraordinary facts, the erroneous submission of a mitigating circumstance is harmless; (6) our Supreme Court has repeatedly upheld submission of the (f)(1) mitigating circumstance in cases where the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that a prior conviction for a crime involving violence to another person was submitted to the jury; and (7) the prosecutor never argued to the jury that defendant had requested this mitigating circumstance, the trial court specifically instructed the jury that defendant did not request it and that the trial court was required by law to give the instruction, and defendant also explained to the jury that he had not requested the mitigating circumstance.

**14. Sentencing— instructions—life imprisonment without parole**

The trial court did not err by denying defendant's request to instruct the jury throughout its sentencing instructions in a first-degree murder case that "life imprisonment" meant "life in prison without parole," because: (1) the trial court instructed the jury pursuant to N.C.G.S. § 15A-2002, which meant it had no duty to inform the jury that a life sentence means life without parole every time it mentioned a life sentence; (2) the jurors twice heard the term "life without parole" as one of the two sentencing alternatives in the trial court's preliminary instructions during jury voir dire; (3) the trial court used corresponding case law to show

that a sentence of life imprisonment means a sentence of life without parole; and (4) the closing arguments of the parties mentioned "life without parole" numerous times.

**15. Sentencing— punishment form—death—life imprisonment**

The trial court did not err in a first-degree murder case by submitting the "Issues and Recommendation as to Punishment" form to the jury with sentencing alternatives of "death" or "life imprisonment" instead of "death" or "life imprisonment without parole," because our Supreme Court has previously held that the form need not describe the punishment as "life imprisonment without parole" when the trial court instructs the jury that life imprisonment means life without parole.

**16. Sentencing— prosecutor's argument—calling each juror by name to impose death sentence**

The trial court did not abuse its discretion in a first-degree murder case by failing to intervene ex mero motu during the prosecutor's sentencing closing argument calling upon each juror by name to impose a sentence of death, because: (1) the prosecutor did not improperly appeal to the jurors' emotions, and the prosecutor did nothing more than argue to the jurors that the State had proven its case and that the jurors should now impose the death penalty; and (2) defendant has failed to show that the prosecutor's sentencing arguments were grossly improper.

**17. Sentencing— death penalty—constitutionality**

The trial court did not err in a first-degree murder case by submitting the death penalty to the jury as a potential punishment even though defendant contends the death penalty violates provisions of the International Covenant on Civil and Political Rights, because: (1) defendant failed to make this objection before the trial court and has not properly preserved this issue for appellate review; and (2) even if defendant preserved this issue, our Supreme Court has previously considered, and affirmed, the constitutionality of our death penalty against the backdrop of the International Covenant on Civil and Political Rights.

**18. Sentencing— aggravating circumstances—murder especially heinous, atrocious, or cruel**

The trial court did not err in a first-degree murder case by submitting the N.C.G.S. § 15A-2000(e)(9) aggravating circum-

stance that the murder was especially heinous, atrocious, or cruel, because in the light most favorable to the State, there was substantial evidence for the jury to conclude that the victim was subjected to both physical and psychological torture beyond that present in most first-degree murders.

## 19. Sentencing— death penalty—proportionate

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) defendant was convicted on the basis of malice, premeditation and deliberation and under the felony murder rule; (2) defendant was convicted of two additional crimes against the victim including first-degree kidnapping and burning of personal property; and (3) the jury found five aggravating circumstances in this case including that the murder was committed during the commission of a first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9), either of which is sufficient standing alone to sustain a death sentence.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Jay D. Hockenbury on 24 August 2001 in Superior Court, Onslow County, upon a jury verdict finding defendant guilty of first-degree murder. On 27 September 2004, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 11 May 2004. Additional issues raised in defendant's supplemental brief determined without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Roy Cooper, Attorney General, by Gail E. Dawson, Special Deputy Attorney General, for the State.*

*Rudolf Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for defendant-appellant.*

LAKE, Chief Justice.

On 2 October 2000, defendant was indicted for the first-degree murder of Elleze Thornton Kennedy. On 27 November 2000, defendant was indicted on additional charges of first-degree kidnapping and burning of personal property. He was tried capitally to a jury at the 9 July 2001 Special Criminal Session of Superior Court, Onslow County,

STATE v. BELL

[359 N.C. 1 (2004)]

the Honorable Jay D. Hockenbury presiding. The jury found defend-
ant guilty of first-degree murder based on malice, premeditation, and
deliberation as well as felony murder and, following a capital sen-
tencing proceeding, recommended that defendant be sentenced to
death. Judge Hockenbury sentenced defendant accordingly. The jury
also found defendant guilty of first-degree kidnapping and burning of
personal property. Judge Hockenbury sentenced defendant to con-
secutive prison terms of 133 months to 169 months for the kid-
napping conviction and 11 to 14 months for the burning of personal
property conviction. Defendant appeals his conviction and death
sentence for first-degree murder to this Court.

The evidence at trial tended to show that on 3 January 2000,
defendant met two friends, Antwaun Sims and Chad Williams, at a
game room in Newton Grove. At defendant's request, Williams
brought a BB gun with him to Newton Grove and gave it to defendant
upon arrival at the game room. After spending some time at the game
room, defendant, Sims, and Williams left for the Newton Grove traffic
circle where they "hung out," smoked marijuana, and drank brandy.
Defendant told Sims and Williams that he wanted to steal a car so that
he could leave town, and Sims said he was "down for whatever." At
that point, defendant spotted Elleze Kennedy leaving Hardee's, and he
said, "I want to rob the lady for her Cadillac."

The evidence further showed that defendant, Sims, and Williams
followed Kennedy to her nearby home and watched as she exited her
car and turned to lock the door. Defendant then ran up to Kennedy,
pointed the BB gun at her and said, "Give me your keys." Kennedy
threw her keys into the yard and began to scream, at which time,
defendant hit her with the gun, knocking her to the ground.

Sims and Williams found the car keys and then put Kennedy into
the car. Kennedy bit Williams as he grabbed her, and Williams
punched her in the jaw to make her release his hand. Defendant sat in
the back seat with Kennedy. Sims drove the car, and Williams sat in
the front passenger seat. At one point, Kennedy asked defendant why
he was so mean and where he was taking her. He responded by hit-
ting Kennedy in the face with the BB gun. Kennedy, bleeding badly at
that point due to repeated beatings, laid her head against the door and
did not say anything else.

Defendant instructed Sims to drive to the Bentonville
Battleground and, upon arrival, defendant, Sims, and Williams pulled
Kennedy from the car and placed her in the trunk. They got back in

the car and drove toward Benson. Kennedy was unconscious when placed in the trunk, but she later awoke and began moving around in the trunk. Defendant told Sims to turn up the radio so that he did not have to listen to Kennedy in the trunk.

The three men then went to the trailer of Mark Snead, Williams' cousin. They went inside and smoked marijuana with Snead. The men told Snead that the car was rented and that the three were traveling to Florida. Soon thereafter, the three left Snead's trailer and went to the trailer of two individuals referred to as Pop and Giovonni Surles, where Sims used Pop's phone to call his girlfriend, and then the three left. Before leaving the trailer park, Williams got out of the car and walked back to Snead's trailer because, as he testified at trial, he did not wish to go anywhere with Kennedy in the trunk of the car. Defendant and Sims returned a short time later and told Williams that they had released Kennedy, after which Williams left with them.

Defendant, Sims, and Williams made one more stop in Benson to clean the blood from the backseat of the car. They then drove towards Fayetteville on Interstate 95. Sims stopped for gas at a truck stop, and defendant looked through Kennedy's purse and found four dollars to use towards gas. While at the gas station, Williams heard movement in the trunk of the car and realized Kennedy was still trapped in the trunk. Williams confronted defendant with his suspicions, and defendant told Williams he was "tripping." Defendant disposed of the BB gun and Kennedy's credit cards by throwing them out of the window along Interstate 95. Once in Fayetteville, Sims stopped the car, and he and defendant went to the trunk. According to Williams' trial testimony, Sims slammed the trunk repeatedly on Kennedy as she was trying to get out.

Defendant then decided that the group needed to return to Kennedy's house in Newton Grove to look for the scope to the BB gun. Defendant did not find the gun scope, but he did find one of Kennedy's shoes. He picked it up and put it in the car. As they were leaving the house, Williams again asked defendant and Sims to release Kennedy. Defendant told Williams they would release Kennedy, but they had to go somewhere else to do so.

The trio left Kennedy's house a second time and drove the car down a path into a field, parking on a hill at the edge of the clearing. Sims turned off the headlights and opened the trunk. Williams testified at trial that he could hear Kennedy moaning. Williams asked defendant what he was going to do. Defendant responded, "Man, I

**STATE v. BELL**

[359 N.C. 1 (2004)]

ain't trying to leave no witness. This lady done seen my face. I ain't trying to leave no witness." With that, defendant shut the trunk on Kennedy. Defendant then got a lighter from Sims and set his coat on fire, threw the burning coat into the car, and shut the door.

The next morning, defendant sent Sims to check on the car. Sims rode his bicycle down to the car and found that the windows were covered in smoke and Kennedy was dead. Sims reported back to defendant, who then called a friend, Ryan Simmons, to come and pick them up. Before leaving the area, defendant had Simmons drive them down to the car. Defendant and Sims got out to wipe fingerprints from the car. Williams stayed in the car with Simmons and admitted to him that the car was stolen. He did not give the details of the prior evening. Simmons took defendant and Williams to their respective houses to get some personal items and then dropped all three at Sims' brother's home, where they stayed for the next few days.

Kennedy's car was discovered by Joe Godwin on 4 January 2000. The car was parked close to Godwin's property line, and when he went to investigate, he found that all of the windows were covered over. At Godwin's request, his wife called the sheriff's department, and a detective discovered Kennedy's body upon examination of the car. An autopsy report concluded that Kennedy suffered several blunt force trauma injuries to the head but ultimately died from carbon monoxide poisoning, a direct result of the fire set by defendant inside of the car. Defendant, Sims, and Williams were ultimately linked to the crime. Williams gave several statements to police and eventually pled guilty to murder, kidnapping, and theft. Williams testified against defendant and Sims in exchange for acknowledgment of his assistance by the prosecution during his own sentencing proceeding.

Defendant asserts several assignments of error in his trial. He additionally argues that the sentence of death imposed upon him is disproportionate to the crime. For the reasons that follow, we find no prejudicial error in defendant's trial and capital sentencing proceeding, nor do we find defendant's death sentence disproportionate.

[1] In his first assignment of error, defendant contends that the trial court violated defendant's constitutional right to a jury of his peers by allowing the State to dismiss jurors on the basis of their race. The State exercised nine peremptory challenges to exclude African-American prospective jurors from the jury in this case. Defendant

argues that the State's conduct constituted a pattern of racial discrimination in violation of defendant's constitutional rights.

The United States Supreme Court addressed this issue in *Batson v. Kentucky* and set forth a three-part test to determine whether the State has impermissibly excluded jurors on the basis of their race in a given case. 476 U.S. 79, 90 L. Ed. 2d 69 (1986). The first step requires the defendant to establish a *prima facie* case of discrimination. *Id.* at 94, 90 L. Ed. 2d at 86-87. If the trial court determines that such a *prima facie* case has been made, the State is then required to offer a facially valid and race-neutral reason for the peremptory challenges. *Id.* at 97, 90 L. Ed. 2d at 88. Finally, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.* at 98, 90 L. Ed. 2d at 88-89.

Generally, when a trial court rules that the defendant has failed to establish a *prima facie* case of discrimination, this Court's review is limited to a determination of whether the trial court erred in this respect. *State v. Barden*, 356 N.C. 316, 343, 572 S.E.2d 108, 127 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). However, " '[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.' " *State v. Lemons*, 348 N.C. 335, 361, 501 S.E.2d 309, 325 (1998) (quoting *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991)), *judgment vacated on other grounds*, 527 U.S. 1018, 144 L. Ed. 2d 768 (1999). Since the State, in the instant case, did offer race-neutral explanations for each challenge, and the trial court ultimately accepted the State's reasons as valid for the exercise of peremptory challenges, "the only issue for us to determine is whether the trial court correctly concluded that the prosecutor had not intentionally discriminated." *Id.* As this Court has held in this regard, the trial court maintains the unique ability to assess, first-hand, all the circumstances relating to the prosecutor's credibility in each case, and we will not overturn its determination absent clear error.

This Court has held that the State may use several general factors to rebut charges of discrimination in the jury selection process, including evidence that the State accepted some jurors of the challenged minority race and that the State did not use all of its peremptory challenges. *See State v. Smith*, 328 N.C. 99, 120-21, 400 S.E.2d 712, 724 (1991). Eighteen African-American prospective jurors were examined in this case. The State exercised peremptory challenges

**STATE v. BELL**

[359 N.C. 1 (2004)]

against nine of those. Two African-American prospective jurors were passed by the State, and the State only used twenty-four of its thirty-two available peremptory challenges.

The State also enumerated specific reasons for exercising peremptory challenges against dismissed jurors each time defendant lodged an objection based on *Batson*. The trial court found the State's reasons to be reasonable and valid, and we agree. Defendant's first *Batson* challenges came when the State used peremptory challenges to dismiss two African-American prospective jurors and one white prospective juror. The State offered valid, race-neutral reasons for the peremptory challenges of both African-American prospective jurors.

Prospective juror Milford Hayes was excused by the State because he was strongly opposed to the death penalty. Mr. Hayes made his opposition clear from the beginning of the jury selection process and continued to state his opinions during jury *voir dire*. He said, in response to a question, that he would be unable to impose a death sentence upon anyone, even Jeffrey Dahmer. Such a strong and absolute opposition to the death penalty is certainly a valid, race-neutral reason for the State to exercise a peremptory challenge.

Prospective juror Mary Shird-Malone was excused by the State because her foster child was seeking psychiatric treatment due to relationship problems with his natural parents. The State expected defendant to put on evidence of problems similar to those of Ms. Shird-Malone's child, and the prosecutor was concerned that Ms. Shird-Malone's personal family situation might make her overly sympathetic to defendant. Concern for undue sympathy towards defendant is a valid and race-neutral reason to exercise a peremptory challenge. Defendant contends that similarly situated jurors were treated differently based upon a difference in race. Defendant asserts that Connie Phillips, a juror of a different race, was similarly situated because she was in a business where she worked with and around psychologists on a daily basis. However, Ms. Phillips stated that her opinion of psychiatrists and psychologists depended upon the individual, and she was not seeking treatment or counseling of any kind. Furthermore, there were factors weighing in favor of Ms. Phillips that were not applicable to Ms. Shird-Malone. Ms. Phillips was married to a twenty-six-year law-enforcement veteran, and she had no objections to the death penalty. All of these factors go to show that Ms. Shird-Malone and Ms. Phillips were not, in fact, similarly situated individuals. Likewise, there were other prospective jurors who had

STATE v. BELL

[359 N.C. 1 (2004)]

minor connections to the psychiatric field, but none were such that they would cause the same concerns expressed by the State regarding Ms. Shird-Malone. No other prospective juror was in a similar situation that would create the same concern as that expressed by the State regarding Ms. Shird-Malone. The State's concerns were valid, race-neutral, and specific to Ms. Shird-Malone.

The State later exercised a peremptory challenge to excuse prospective juror La Star Williams, and defendant again objected based on *Batson*. The State offered several race-neutral reasons for exercising a peremptory challenge to excuse Ms. Williams. Ms. Williams was pregnant, and although she was starting to feel better, she had been very sick. The State felt that Ms. Williams may find it difficult to vote for the death penalty when she was carrying a life of her own. Additionally, Ms. Williams seemed unhappy to be there and inattentive at times. She also had a brother who had recently been prosecuted for stealing by the same district attorney's office prosecuting defendant's case. All of these factors, taken together, serve as valid, race-neutral reasons for dismissing Ms. Williams. Defendant again contends that similarly situated prospective jurors were treated differently based only on their race. One prospective juror's father had been convicted of "price fixing" years before. Another prospective juror's stepson, with whom he had no relationship, was charged with first-degree rape. Defendant claims that because these two prospective jurors had family members with legal troubles, they too should have been dismissed but were not because of their race. However, these two jurors had only one factor in common with Ms. Williams. There were a number of reasons why the State chose to exercise a peremptory challenge against Ms. Williams. While each of the factors may or may not have been sufficient individually, it was the combination that led the State to act as it did. Defendant has failed to establish disparate treatment because the same combination of factors was not present in the other two prospective jurors.

The State also exercised a peremptory challenge to excuse prospective juror Yvonne Midgette. Ms. Midgette was dismissed by the State for several reasons. First, Ms. Midgette ran a prison ministry and dealt with violent criminals on a regular basis. The State was concerned that Ms. Midgette might find it difficult to sentence a man to death considering her prison ministry work. Other factors leading the State to excuse Ms. Midgette included her position as chairperson of Alcoholics Anonymous and the personal problems she was having with her daughter. The State felt that these factors might cause Ms.

Midgette to be unduly sympathetic to defendant during the sentencing phase. The State's reasons for exercising a peremptory challenge to excuse Ms. Midgette were valid and race-neutral.

Defendant next made a *Batson* objection to the State's peremptory challenge of prospective juror Viola Denise Morrow. Ms. Morrow suffers from rheumatoid arthritis. The State was concerned about having Ms. Morrow serve as a juror because she could, on any given day, suffer so much pain that she would be unable to participate in the proceedings. This was a valid and race-neutral reason to excuse Ms. Morrow.

The State exercised a peremptory challenge to excuse prospective juror Diana Roach over defendant's *Batson* objection. The State exercised a peremptory challenge against Ms. Roach because she did not believe in the death penalty. Ms. Roach testified that she was adverse to the death penalty and had been so opposed for her entire life. The State's reason was valid and race-neutral.

The State exercised a peremptory challenge to excuse prospective juror June Leaks based on similar reasoning. The State was concerned about Ms. Leaks' ability to recommend death because as soon as the State brought up the subject, Ms. Leaks began darting her eyes, twisting in her chair, and hesitating in her answers. Defendant contends that a similarly situated juror was passed by the State and that the only difference between the two was their race. Defendant claims that prospective juror Merilyn Thomasson was passed by the State even though she, like Ms. Leaks, seemed uncomfortable with the death penalty. However, Ms. Thomasson testified during *voir dire* that she was sure she could consider the death penalty and recommend it, if proper. She also had previously served on a criminal jury. These factors distinguish Ms. Leaks from Ms. Thomasson, and the State's reason for excusing Ms. Leaks is valid and race-neutral.

The State used a peremptory challenge to excuse prospective juror Mary Adams, over defendant's *Batson* objection. The State explained that Ms. Adams was excused based on several factors. Ms. Adams was a homemaker with a child with special needs. The State was concerned that Ms. Adams might be more lenient or sympathetic towards defendant for these reasons. Further, Ms. Adams had been charged with failure to pay state sales tax in 1998. While the charge was ultimately dropped, the crime was one of fraud or dishonesty which caused the State some concern. Defendant contends that similarly situated jurors were treated differently based upon their race. As

support for this contention, defendant points to two other jurors with previous experiences in the criminal justice system who were passed by the State. While there were other jurors who had earlier encounters with the criminal justice system, no juror had experienced all of the circumstances that caused the State to dismiss Ms. Adams. The State did not engage in disparate treatment, and the reasons for the State's peremptory challenge of Ms. Adams were valid and race-neutral.

The State exercised a ninth peremptory challenge to excuse prospective juror Donald Morgan. Mr. Morgan, like Ms. Adams, had a criminal record. He also had a child with substance abuse issues, and he worked in the mental health field. The factors leading the State to exercise a peremptory challenge against Mr. Morgan were valid and race-neutral.

The State provided valid and race-neutral reasons for exercising each peremptory challenge objected to on the basis of *Batson*. The trial court properly determined, after each *Batson* objection, that the State did not discriminate against African-American prospective jurors on the basis of their race. Defendant's assignment of error is without merit.

[2] In his second assignment of error, defendant contends that the trial court violated defendant's right to a fair trial and due process of law by joining the trials of defendant and codefendant Antwaun Sims. Prior to trial, the State made a motion to join defendant and codefendant's cases for trial. Defendant objected to joinder, but the trial court granted the State's motion. Several months later, and still before trial, defendant made a motion to sever his case from that of his codefendant. The trial court, finding no change in circumstances making it necessary to sever the cases, denied defendant's motion. Defendant renewed his motion several more times throughout the trial, and the trial court repeatedly denied it. Defendant contends that the trial court erred by denying defendant's motions to sever and that, as a result, he received an unfair trial. We disagree.

Joinder is appropriate when (1) each defendant is charged with accountability for each offense; or (2) the offenses charged were (a) part of a common scheme, (b) part of the same transaction, or (c) so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others. N.C.G.S. § 15A-926(b)(2) (2003). " 'The propriety of joinder depends upon the circumstances of each case and is within the sound discretion of the

trial judge.' " *State v. Golphin*, 352 N.C. 364, 399, 533 S.E.2d 168, 195 (2000) (quoting *State v. Pickens*, 335 N.C. 717, 724, 440 S.E.2d 552, 556 (1994)), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). The trial court's decision to consolidate cases for trial will not be disturbed on appeal absent a showing that joinder resulted in defendant receiving an unfair trial. *Id.*

Here, defendant and codefendant Sims were each charged with accountability for first-degree murder, first-degree kidnapping, and burning of personal property. Additionally, these charges arose from the same series of events involving the same victim and witnesses, and the evidence tended to indicate a common scheme. There was ample reason for the trial court to decide to join the cases for trial.

Defendant contends that he received an unfair trial as a result of the joinder because inflammatory evidence was admitted against codefendant Sims which likely prejudiced defendant's case. At trial, the State introduced evidence that a cloth containing semen was discovered in the victim's car. The State's DNA evidence connected the cloth to codefendant Sims. Both defendant and codefendant Sims argued that this evidence was prejudicial because the jury could use the evidence to infer a sexual assault. The trial court allowed the evidence and instructed the jury that it could consider the evidence for purposes of identification and corroboration, but it could not consider the evidence as proof of a sexual assault on the victim. Defendant contends that, despite the trial court's instruction, the evidence could have inflamed the jury, thereby prejudicing defendant's case. However, the State's main witness, Chad Williams, testified that no sexual assault occurred, and the medical examiner testified that there was no evidence of a sexual assault. This testimony, coupled with the trial court's limiting instruction, was sufficient to safeguard against the jury's misuse of the State's evidence against defendant.

Defendant additionally contends that he received an unfair trial as a result of joinder because codefendant Sims exercised a peremptory challenge against a prospective juror defendant would have chosen. The trial court conducted jury selection by having one defendant question all jurors passed by the State and exercise all of his peremptory challenges before the other defendant examined the jurors. Codefendant Sims was given the first opportunity to question the prospective jurors and, despite defendant's vocal approval of a particular juror, codefendant Sims exercised a peremptory challenge to excuse that prospective juror from the panel.

The trial court's method of jury selection in this joint trial did not prejudice defendant. The very nature of a joint trial requires that each defendant be entitled to exercise his peremptory challenges separate and independent of his codefendant. Regardless of the method, each defendant would have the opportunity to question and excuse jurors from service. If elimination of a desirable juror were a reason for severance, joinder would never occur. Codefendant Sims' exercise of a peremptory challenge during jury selection to excuse a prospective juror defendant wanted did not result in an unfair trial for defendant and did not require severance.

Defendant further contends that codefendant Sims' alibi evidence and jury arguments prejudiced defendant, requiring severance and separate trials. Sims offered witness testimony that he was not present when Ms. Kennedy was kidnapped or assaulted. Codefendant Sims argued to the jury that defendant and Chad Williams were the true culprits in this crime. Defendant argues that Sims' trial tactics prejudiced him and required severance and separate trials. However, there was ample evidence presented at trial to implicate both defendant and codefendant Sims in the murder of Ms. Kennedy. Codefendant Sims' witnesses did nothing to further incriminate defendant. In fact, defendant used some of codefendant Sims' witnesses to advance his own case. The jury apparently did not find codefendant Sims' evidence persuasive, because he was convicted of the charges against him as well. The jury was picked fairly, and a solid case was presented against both defendant and codefendant Sims. Joinder in this case was proper and did not cause defendant an unfair trial. This assignment of error is overruled.

[3] Defendant's third assignment of error is that the trial court erred by placing certain prospective jurors in specific jury panels, thus violating the requirement for random jury selection. Section 15A-1214 of the North Carolina General Statutes states in part that "[t]he clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." N.C.G.S. § 15A-1214(a) (2003). Here, the clerk randomly called prospective jurors to be assigned to eight different panels. However, three prospective jurors were left unassigned to panels. Defendant contends that the trial court violated the randomness requirement of N.C.G.S. § 15A-1214 by assigning those three remaining prospective jurors to the last jury panel, thus requiring a new trial. We hold that defendant failed to properly preserve this issue for our review.

A defendant's challenge to a jury panel must be made in accordance with the requirements of N.C.G.S. § 15A-1211(c), which states that a challenge to a jury panel:

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

N.C.G.S. § 15A-1211(c) (2003). Here, defendant never made a challenge to the jury selection process. In fact, defendant requested that two of the three remaining jurors, about whom he now objects, be assigned to the last panel. At the conclusion of jury selection, defendant was asked if he approved of the jury panel. Defendant answered affirmatively, again without objection to the jury selection process. Because defendant failed to challenge the jury selection process in accordance with N.C.G.S. § 15A-1211(c), he now cannot request appellate review. *See e.g., State v. Jones,* 358 N.C. 330, 337-38, 595 S.E.2d 124, 130 (2004); *State v. Cummings,* 353 N.C. 281, 292, 543 S.E.2d 849, 856, *cert. denied,* 534 U.S. 965, 151 L. Ed. 2d 286 (2001); *State v. Atkins,* 349 N.C. 62, 102-03, 505 S.E.2d 97, 122 (1998), *cert. denied,* 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). Defendant's assignment of error is overruled.

[4] Defendant's fourth assignment of error is that the trial court erred by allowing the prosecutor to make certain characterizations of defendant during the State's closing argument. The prosecutor began his guilt-phase closing argument by saying:

He who hunts with the pack is responsible for the kill. Each of you [has] seen those nature shows: Discovery Channel, Animal Planet. You've seen where a pack of wild dogs or hyenas in a group attack a herd of wildebeests, and they do it as a group.

When they take that wildebeest, one of them might be the one that chases after it and grabs the leg of the wildebeest, slows them down. Another one might be out fending off the wildebeests that are coming and making their counterattacks. You have another that will be the one that actually grasps its jaws about the throat of the wildebeest, ultimately, crushing the throat and taking the very life out of that animal.

He who hunts with the pack is responsible for the kill. Each and every one of those animals are responsible for that kill. Each and every one of those animals will feast on the spoils of that kill. He who hunts with the pack is responsible for the kill.

Just like the predators of the African plane [sic], Chad Williams, Antwaun Sims, and Christopher Bell stalked their prey. They chased after their pray [sic]. They attacked their prey. Ultimately, they fell [sic] their prey.

Defendant contends that the prosecutor's characterizations were abusive and improper, in violation of N.C.G.S. § 15A-1230(a). We disagree.

"Counsel are afforded wide latitude in arguing hotly contested cases, and the scope of this latitude lies within the sound discretion of the trial court." *State v. Gregory*, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). A prosecutor's arguments are not to be reviewed in isolation; rather, consideration must be given to the context of the remarks and to the overall factual circumstances. *State v. Moseley*, 338 N.C. 1, 50, 449 S.E.2d 412, 442 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995).

Looking at the prosecutor's statements in context, it is clear that the prosecutor employed the use of an analogy to aid in explaining a complex legal theory. Defendant and codefendant Sims were prosecuted on the theory that they "acted in concert" with Chad Williams to steal the victim's car, kidnap the victim, and eventually murder the victim. The statement, "he who hunts with the pack is responsible for the kill" is a passage that serves to illustrate for juries the theory of acting in concert. *See State v. Lee*, 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970).

Here, the prosecutor built upon the basic premise that "he who hunts with the pack is responsible for the kill." The prosecutor created a clear representation of the "pack mentality" for the jury by describing how animals hunt their prey. Reading the text of the prosecutor's argument in its entirety, it is clear that the prosecutor was using an analogy to explain the theory of acting in concert for the jury. The prosecution even went so far as to directly link the analogy to the legal principle, stating, "[h]e who hunts with the pack is responsible for the kill. It's called acting in concert. That's a legal term." Given that the prosecution clearly linked its analogy to the legal

theory it was meant to represent, we cannot now say that the trial court erred by allowing the prosecution to make its argument.

[5] The prosecutor also stated during closing arguments, "[i]f you are going to try the devil, you have to go to hell to get your witnesses." Defendant contends that this also was an improper and inflammatory characterization. Again, we disagree.

The prosecutor made this statement in response to a direct attack by defendant on the credibility of the State's star witness, Chad Williams. The prosecution defended Williams' credibility to the extent that one can defend the credibility of a participant in the crime:

> I want to talk to you a little bit about Chad Williams. One of the things you may wonder—they made a big deal about was why did you put Chad on? Why call Chad as a witness? Think about it. Our job and what we attempted to do is to put on all the evidence before you to give you what happened that night, put it all on. That includes to put on what happened that night.

> Now, if the physical evidence tells you things—we wanted to flesh out what happened that night, flesh out the details. The physical evidence doesn't talk and Ms. Kennedy can't tell us. We don't have her to call up here and say, Ms. Kennedy, what did these boys do to you? What did they do to you? She is just standing there in the yard, getting out of her car, and these young men come up and attack her. We don't have her to tell the story.

> What we do have is Chad Williams. We put him on, and the defense attorneys, How dare you call someone like that. How dare you call somebody who is a liar, who is a convicted murderer who says all these things. How dare you do that.

> Well, I can tell you if there would have been a Baptist or Methodist preacher that was riding with these guys that night and could tell you what happened that night and live to tell it, I would be the first one to call him. I would put him up here. We don't have that luxury.

Over defendant's objection, the prosecutor went on to say, "[i]f you are going to try the devil, you have to go to hell to get your witnesses."

We have previously considered and approved use of the phrase to which defendant objects. *State v. Willis*, 332 N.C. 151, 171, 420 S.E.2d 158, 167 (1992). In *Willis*, the State used the phrase to illustrate the type of witnesses available to the State. *Id.* Here, just as in *Willis*, the

prosecutor's statement was meant merely to illustrate the type of witness available in this case. Chad Williams was a participant in the crime, not an innocent person. In this case, Williams' credibility is not based on his character. It is based upon his participation in the events to which he testified.

After reviewing each of the prosecutor's statements in context, we conclude that neither statement amounted to improper characterization or name calling. The prosecution, in its zealous representation of the State, simply used vivid analogies to illustrate points for the jury. The trial court did not err in allowing the prosecution's statements. This assignment of error is overruled.

**[6]** Defendant's fifth assignment of error is that the trial court erred by telling the jury that its decision would be reviewed by an appellate court. Defendant contends that the trial court's statements to the jury insinuated that any error the jury made would be corrected by a higher court, thereby reducing the jury's feeling of responsibility for its decision. Defendant did not object to the trial court's jury charge at the time.

Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure provides:

A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2). Because defendant did not object to the trial court's statements at the time they were made, we are now limited to conducting a plain error review. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).

[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is

such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*Id.* at 660, 300 S.E.2d at 378 (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir.), *cert. denied,* 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)) (internal citations omitted). "The adoption of the 'plain error' rule does not mean that every failure to give a proper instruction mandates reversal regardless of the defendant's failure to object at trial. To hold so would negate Rule 10(b)(2) which is not the intent or purpose of the 'plain error' rule." *Id.* (citing *United States v. Ostendorff,* 371 F.2d 729 (4th Cir.), *cert. denied,* 386 U.S. 982, 18 L. Ed. 2d 229 (1967)). "[E]ven when the 'plain error' rule is applied, '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *Id.* at 660-61, 300 S.E.2d at 378 (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)). "In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." *Id.* at 661, 300 S.E.2d at 378-79 (citing *United States v. Jackson,* 569 F. 2d 1003 (7th Cir.), *cert. denied,* 437 U.S. 907, 57 L. Ed. 2d 1137 (1978)).

Here, the statements made by the trial court cannot even be considered instructions to the jury. The trial court made three statements of which defendant now complains. The first statement was made upon first meeting with the jurors. Upon review of Judge Hockenbury's opening statements in context, it is clear that the trial court's statements were merely introductory in nature and were not meant to influence or instruct the jury in any way. Judge Hockenbury introduced himself to the jury and then proceeded to introduce court personnel who would be in the courtroom during jury selection and the trial. In making its introductions, the trial court said the following:

Let me introduce some of the court personnel that you will see up here who will be working during this term of court. The Clerk of Superior Court here in Onslow County is The Honorable Ed Cole, and the courtroom clerk here to my right is Lisa Edwards. She will be the clerk during your jury selection process during this term. It's a pleasure to have her here with us. She will,

of course, assist the Court with all the administrative matters that the Court has to do when they hold superior court.

The court reporter here to my left is Briana Nesbit. Her job is to take down and transcribe everything that is said here in the courtroom. As you could see when we had the conference here at the bench, Mrs. Nesbit came over with her machine and transcribed everything that was said here. This is very important because this court is the highest level trial court of the State of North Carolina. The decisions in this court get appealed to the North Carolina Court of Appeals or the North Carolina Supreme Court, as the case may be. Everything needs to get transcribed for that purpose.

Defendant now objects to the portion of Judge Hockenbury's statement referencing appeal of decisions to the North Carolina Court of Appeals and to this Court. However, reviewing this statement in context, it is clear that he merely wished to explain the function of the court reporter to the jury. We do not view this statement as a jury instruction, and therefore, it does not fall within the purview of plain error.

The second statement to which defendant now objects was made during the jury selection process. The trial court was asking a prospective juror questions about her ability to consider the death penalty as a punishment. The prospective juror responded by nodding her head, and the trial court informed the juror that she should speak audibly because the court reporter was recording responses "for appellate purposes." The trial court's statement did not constitute a jury instruction and thus does not fall within the purview of plain error.

The third statement to which defendant now objects occurred during a break in trial proceedings when the trial court took a moment to recognize "National Court Reporter Day." The trial court took the opportunity to explain the importance of court reporters in honor of the special day:

Also, this was a day today for a ceremony for Briana Nesbit. It's National Court Reporter Day, August 3, 2001. We had a ceremony honoring her for the good job that she does for the superior court. There wouldn't be any Supreme Court, because this is the highest level trial court, unless we had a court reporter transcribing. That's how integral they are to the judicial process.

Again, the trial court's statements did not constitute jury instructions and thus do not fall within the purview of plain error. Because none of the trial court's statements regarding appellate review were made for the purpose of instructing the jury as to its role in deciding defendant's case, we decline to consider the merits of defendant's argument. This assignment of error is overruled.

[7] Defendant's sixth assignment of error is that the trial court erred by failing to dismiss the first-degree kidnapping charge against defendant. Defendant contends that the State presented insufficient evidence to convict defendant of first-degree kidnapping under any of the theories submitted, and therefore, the trial court should have dismissed the charge. We disagree.

When ruling on a motion to dismiss, the trial court must determine whether the prosecution has presented "substantial evidence of each essential element of the crime." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). " 'Substantial evidence is that amount of "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." ' " *State v. Williams*, 355 N.C. 501, 579, 565 S.E.2d 609, 654 (2002) (quoting *State v. Armstrong*, 345 N.C. 161, 165, 478 S.E.2d 194, 196 (1996)), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003) (internal citation omitted). In making its decision, the trial court must view the evidence in the light most favorable to the State. *State v. Hyatt*, 355 N.C. 642, 666, 566 S.E.2d 61, 77 (2002), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003).

Kidnapping is the unlawful confinement, restraint, or removal of a person from one place to another for the purpose of: (1) holding that person for a ransom or as a hostage, (2) facilitating the commission of a felony or facilitating flight of any person following the commission of a felony, (3) doing serious bodily harm to or terrorizing the person, or (4) holding that person in involuntary servitude. N.C.G.S. § 14-39(a) (2003). Kidnapping is considered to be in the first-degree when the kidnapped person is not released in a safe place or is seriously injured or sexually assaulted during the commission of the kidnapping. N.C.G.S. § 14-39(b).

Defendant was indicted for first-degree kidnapping on the basis that he confined, restrained, or removed the victim to facilitate felonious larceny of a motor vehicle, burning of personal property, and assault with a deadly weapon,[1] resulting in serious injury to the vic-

---

1. First-degree murder was also included as an underlying felony in the first-degree kidnapping indictment. The State did not pursue this theory, and the jury was not instructed to consider it.

tim. Defendant was also indicted for first-degree kidnapping on the basis that he confined, restrained, or removed the victim for the purpose of doing serious bodily harm to or terrorizing the victim, resulting in serious injury to the victim. The State presented sufficient evidence at trial of each of these alternative theories of first-degree kidnapping in order to survive a motion to dismiss.

Substantial evidence was presented by the State that defendant intended to steal the victim's car and that he kidnapped the victim to facilitate the theft. Chad Williams testified that defendant stated he wanted to steal a car so that he could leave town. Williams also testified that when defendant spotted the victim getting into her car, defendant said, "I want to rob the lady for her Cadillac." Williams testified that the three approached the victim in her driveway, and defendant pointed a gun at her and demanded the keys to the vehicle. The victim threw the keys and began to scream. At that point, defendant hit the victim with the gun and ordered Williams and Sims to place the victim in the car. Defendant's action in confining the victim was clearly meant to facilitate the larceny of the car. The victim was screaming, and defendant acted so as to prevent the victim from calling attention to the crime.

Substantial evidence also was presented that defendant continued to confine the victim in order to facilitate his repeated assaults upon her with a deadly weapon. The evidence presented at trial indicated that defendant got in the backseat with the victim upon initially stealing the car. According to testimony, defendant repeatedly hit the victim in her face with the gun until she quit struggling and lay back quietly against the door. Defendant then had Sims stop the car, and the three confined the victim to the trunk of her car. The State's evidence at trial indicated that defendant continued to confine the victim in the back seat and in the trunk in order to facilitate the larceny of her vehicle and defendant's continued assaults upon the victim.

In addition, substantial evidence was presented that defendant confined the victim in order to facilitate the burning of her personal property. The three eventually drove the car to a secluded area and opened the trunk to check on the victim. Upon noticing that the victim was still alive, defendant closed the trunk, set fire to his coat, and threw it in the car. Defendant's actions in continuing to confine the victim facilitated the burning of the car.

While it may have been unnecessary to confine, restrain, or remove the victim in order to accomplish any of the defendant's

crimes, substantial evidence was presented that defendant did, in fact, make the decision to confine, restrain, and remove the victim in order to facilitate larceny of a motor vehicle, assault with a deadly weapon, and burning of personal property. Substantial evidence also was presented that defendant's actions were meant to terrorize the victim. Defendant beat the victim, yelled at her, and confined her to the trunk of her car for hours. Defendant's actions resulted in serious injury, and ultimately death, to the victim. Therefore, each element of first-degree kidnapping was established. The evidence presented by the State was sufficient to submit each of these alternative theories of first-degree kidnapping to the jury. This assignment of error is overruled.

[8] Defendant's seventh assignment of error is that the trial court erred in allowing a prior statement of witness Chad Williams into evidence for the purpose of corroborating his trial testimony. Defendant contends that the prior statement was different from Williams' trial testimony and, therefore, not corroborative. However, defendant failed to object at trial or properly preserve this issue for appellate review.

Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure states that "[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(b)(1). In this case, defendant did not object to the testimony of Agent Jay Tilley regarding various prior statements made by the State's witness, Chad Williams. Codefendant Sims made an objection to the testimony, arguing that it was repetitive and noncorroborative. Defendant never separately objected or joined in codefendant Sims' objection, thereby waiving his right to appellate review.

Defendant has further waived his opportunity for plain error review of this issue. Rule 10(c)(4) of the North Carolina Rules of Appellate Procedure requires that an assignment of error be "specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4). Defendant failed to specifically assert plain error. He therefore failed to properly preserve this issue for appellate review. This assignment of error is overruled.

[9] Defendant's eighth assignment of error is that the trial court erred in submitting the charges of first-degree murder and first-degree kid-

napping based on the victim having been seriously injured because the two charges together violate double jeopardy principles. Defendant failed to object to submission of these charges at trial, and he has therefore failed to properly preserve this issue for appellate review.

"It is well settled that an error, even one of constitutional magnitude, that defendant does not bring to the trial court's attention is waived and will not be considered on appeal." *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39 (2002), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). Here, not only did defendant fail to raise the issue at trial, he failed to properly raise double jeopardy in his assignments of error. Defendant refers to the following assignment of error as the basis for his double-jeopardy argument:

> 34. The trial court committed reversible or, in the alternative, plain error in overruling defendant's objection to an instruction on kidnapping for the purpose of committing an assault with a deadly weapon inflicting serious injury, as this instruction was not supported by the evidence and the applicable legal authorities, thereby denying defendant his federal and state constitutional rights to a fair trial, due process of law, equal protection of the law, and freedom from cruel and unusual punishment.

This assignment of error makes no reference to double jeopardy or submission of a first-degree murder charge. The transcript pages cited, likewise, do not reference double jeopardy. "Our scope of appellate review is limited to those issues set out in the record on appeal." *State v. Hamilton*, 351 N.C. 14, 22, 519 S.E.2d 514, 519 (1999), *cert. denied*, 529 U.S. 1102, 146 L. Ed. 2d 783 (2000). Given that defendant failed to raise double jeopardy at trial, and his assignment of error makes no reference to the issue, he has not properly preserved the issue for our review. This assignment of error is overruled.

[10] Defendant's ninth assignment of error is that the trial court erred in instructing the jury and submitting a verdict form which did not require the jury to be unanimous as to the purpose for which the victim was kidnapped. We note at the outset that it is unclear whether defendant objected to the kidnapping instruction at the trial level on this particular basis as required by Rule 10(b)(1). However, even if defendant properly preserved this issue for appellate review, we conclude there was no error.

The trial court instructed the jury as to first-degree kidnapping, in accord with the pattern jury instructions, as follows:

> The elements of first-degree kidnapping under the theory of facilitating a felony or inflicting serious injury are:
>
> First, that the defendant, or someone with whom he was acting in concert, unlawfully confined a person, Elleze Kennedy, that is, imprisoned her within a given area or restrained a person, that is, restricted her freedom of movement, or removed a person from one place to another.
>
> Second, that the person, Elleze Kennedy, did not consent to this confinement or restraint or removal.
>
> Third, that the defendant, or someone with whom he was acting in concert, confined or restrained or removed that person for the purpose of facilitating the defendant's commission, or the commission by someone with whom he was acting in concert, of felonious larceny of a vehicle, or burning of personal property, or assault with a deadly weapon inflicting serious injury, or for the purpose of doing serious bodily injury to that person.

Similar instructions were given when the trial court instructed the jury on kidnapping as an underlying felony to support a conviction for felony murder. Defendant contends that the trial court's disjunctive instructions were fatally ambiguous because the jury could have convicted defendant without a unanimous decision that defendant confined, restrained, or removed the victim for the purpose of committing a specific crime. We disagree.

Two lines of cases have developed regarding the use of disjunctive jury instructions. *State v. Diaz* stands for the proposition that

> a disjunctive instruction, which allows the jury to find a defendant guilty if he commits either of two underlying acts, *either of which is in itself a separate offense*, is fatally ambiguous because it is impossible to determine whether the jury unanimously found that the defendant committed one particular offense.

*State v. Lyons*, 330 N.C. 298, 302-03, 412 S.E.2d 308, 312 (1991) (citing *Diaz*, 317 N.C. 545, 346 S.E.2d 488 (1986). In such cases, the focus is on the conduct of the defendant. *Id.* at 307, 412 S.E.2d at 314.

In contrast, this Court has recognized a second line of cases standing for the proposition that "if the trial court merely instructs the jury disjunctively as to various alternative acts *which will establish an element of the offense,* the requirement of unanimity is satisfied." *Lyons,* 330 N.C. at 302-03, 412 S.E.2d at 312 (citing *State v. Hartness,* 326 N.C. 561, 391 S.E.2d 177 (1990)). In this type of case, the focus is on the intent or purpose of the defendant instead of his conduct.

The present case falls into the *Hartness* line of cases. N.C.G.S. § 14-39(a) provides that a defendant is guilty of kidnapping if he

shall unlawfully confine, restrain, or remove from one place to another, any other person . . . without the consent of such person . . . if such confinement, restraint or removal is for the purpose of:

> (1) Holding such other person for a ransom or as a hostage or using such other person as a shield; or

> (2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony; or

> (3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person; or

> (4) Holding such other person in involuntary servitude in violation of G.S. 14-43.2.

N.C.G.S. § 14-39(a). This statute provides numerous routes by which a defendant may be convicted of first-degree kidnapping. Ultimately, however, a defendant can only be found guilty and punished once. It is not necessary for the State to prove, nor for the jury to find, that a defendant committed a particular act other than that of confining, restraining, or removing the victim. Beyond that, a defendant's intent or purpose is the focus, thus placing the case *sub judice* squarely within the *Hartness* line of cases. The trial court's instructions and the verdict form were proper. This assignment of error is overruled.

[11] Defendant's tenth assignment of error is that the trial court erred in submitting the (e)(6) aggravating circumstance that the murder was committed for pecuniary gain because the evidence did not show that defendant killed the victim to obtain money.

At the beginning of the sentencing proceeding charge conference, the State requested submission of the pecuniary gain aggravating cir-

cumstance, as well as several other aggravating circumstances for consideration during the sentencing for defendant's first-degree murder conviction. Defendant objected solely on the basis of double counting and argued that the jurors should not be permitted to use larceny of a car to support two different aggravating circumstances: (1) that the murder was committed while the defendant was engaged in the commission of a first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5), and (2) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). In response to defendant's concerns of double counting, the trial court limited the evidence supporting the aggravating circumstance that defendant murdered the victim for pecuniary gain to evidence that money was taken from the victim's purse. The trial court also limited the evidence to support the aggravating circumstance that the murder was committed during the course of the kidnapping to evidence that defendant kidnapped the victim to facilitate the larceny of the car. Defendant approved the instructions after these changes were made.

Further, during argument on how to instruct the jury regarding the aggravating circumstances, defendant actually supplied the trial court with the language it used to instruct the jury for the pecuniary gain circumstance. At no time did defendant object or argue that the evidence was insufficient to submit the pecuniary gain aggravating circumstance. The only objection defendant made was that the same evidence was being used to support more than one aggravating circumstance. These concerns were alleviated when the trial court limited the evidence for the aggravating circumstances and defendant agreed to the changes.

"Defendant may not swap horses after trial in order to obtain a thoroughbred upon appeal." *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988); *see also State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996); *State v. Frye*, 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

Defendant did not object to the sufficiency of the evidence to support the pecuniary gain aggravating circumstance at trial and has not preserved this issue for appellate review. N.C. R. App. P. 10(b)(1). In fact, defendant expressly approved the action of the trial court to which he now objects. Because defendant did not properly preserve this issue for our review, this assignment of error should be overruled.

Even if defendant had properly preserved this issue for appeal, he has failed to demonstrate that the trial court erred in submitting the aggravating circumstance that the murder was committed for pecuniary gain, specifically to obtain money. " 'In determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom.' " *State v. Anthony*, 354 N.C. 372, 434, 555 S.E.2d 557, 596 (2001) (quoting *State v. Syriani*, 333 N.C. 350, 392, 428 S.E.2d 118, 141, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993)), *cert. denied*, 536 U.S. 930, 153 L. Ed. 2d 791 (2002). In order to submit the pecuniary gain aggravating circumstance, there must be evidence that defendant was motivated to kill, at least in part, for money or something of value. *State v. White*, 355 N.C. 696, 710, 565 S.E.2d 55, 64 (2002), *cert. denied*, 537 U.S. 1163, 154 L. Ed. 2d 900 (2003). However, financial gain need not be defendant's primary motivation. *State v. Davis*, 353 N.C. 1, 36, 539 S.E.2d 243, 266 (2000), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 55 (2001).

The evidence at trial showed that defendant wished to leave Newton Grove but had no car and no job. Therefore, in order to leave town, defendant needed a means of transportation and money to finance his trip. It is reasonable to infer, based on the evidence, that defendant acted for his own pecuniary gain when he kidnapped the victim, stole her car, looked through her purse, and took her money. While obtaining a car may have been defendant's primary motivation, it may be reasonably inferred from the evidence that he was also motivated by the need for money.

The fact that defendant killed the victim after he had obtained the money from her purse is irrelevant. This Court addressed the issue in *State v. Oliver* and determined that the hope of pecuniary gain and the murder itself were "inextricably intertwined." 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981). The hope of pecuniary gain motivated the murder which was ultimately committed in an effort to enjoy the fruits of the crime. *Id.* The evidence here showed that defendant unequivocally told his codefendants that he had no intention of leaving a witness. It is reasonable to infer from the evidence that defendant, motivated by the hope for pecuniary gain, kidnapped the victim, stole her car and her money, and then killed her in an attempt to elude the authorities. Considering the evidence in the light most favorable to the State, we hold that there was sufficient evidence to support submission of the pecuniary gain aggravating circumstance based on

defendant's theft of money from the victim's purse. This assignment of error is overruled.

On 7 May 2004, this Court allowed defendant's motion to amend the record on appeal and motion to file a supplemental brief addressing two additional assignments of error. In one of defendant's additional assignments of error, he contends that the trial court improperly and unconstitutionally instructed the jury on the pecuniary gain aggravating circumstance. Defendant failed to object to this jury instruction, and this Court is limited to a plain error review. *See Odom*, 307 N.C. at 659, 300 S.E.2d at 378. However, a review of the record shows that not only did defendant fail to object to the trial court's jury instruction regarding pecuniary gain, he actually supplied the trial court with the language that it used in instructing the jury on this aggravating circumstance.

This Court has consistently denied appellate review to defendants who have attempted to assign error to the granting of their own requests. In *State v. Basden*, the defendant requested a jury instruction on a mitigating circumstance and expressed his satisfaction with the proposed jury instruction when read by the trial court. 339 N.C. 288, 302, 451 S.E.2d 238, 246 (1994), *cert. denied*, 515 U.S. 1152, 132 L. Ed. 2d 845 (1995). The trial court instructed the jury in accordance with the defendant's request, and the defendant voiced no objection. *Id.* On appeal, the defendant challenged the language used in the instruction. *Id.* This Court rejected the defendant's contention and stated: "Having invited the error, defendant cannot now claim on appeal that he was prejudiced by the instruction." *Id.* at 303, 451 S.E.2d at 246; *see also* N.C.G.S. § 15A-1443(c) (2003); *State v. Harris*, 338 N.C. 129, 150, 449 S.E.2d 371, 380 (1994), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995); *State v. Weddington*, 329 N.C. 202, 210, 404 S.E.2d 671, 677 (1991).

Here, the evidence shows that the trial court and the State agreed with defendant's request to limit the instruction on the pecuniary gain aggravating circumstance to the money taken from Ms. Kennedy's purse. The trial court and the State further agreed to limit the instruction on the aggravating circumstance that the murder was committed during the commission of a first-degree kidnapping to evidence that the victim was kidnapped to facilitate the larceny of the car. The record shows that these instructions were so modified in response to defendant's concerns.

Furthermore, reading the jury instruction as a whole, we cannot say as a matter of law that the error, if any, rose to the level of plain error such that there is a reasonable probability that the result would have been different had the error not occurred. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). This assignment of error is overruled.

[12] In defendant's other additional assignment of error set forth in his supplemental brief, he contends that the trial court erred by overruling his objection to the admission of a testimonial statement made by a witness who was not found to be unavailable and had never been subjected to cross-examination by defendant. During the sentencing phase of defendant's trial, one of the aggravating circumstances upon which the State relied was defendant's commission of a prior crime of violence. *See* N.C.G.S. § 15A-2000(e)(3) (2003). To prove this aggravating circumstance, the State introduced an indictment and judgment against defendant for a prior common-law robbery. The State also called Officer John Conerly to testify regarding the incident because he had investigated the robbery and taken a statement from the victim at the time of the crime. The prosecutor explained, "[T]he victim is not available. The victim was a Hispanic and has left, we tracked, pulled the record, he's left the state and possibly the country." The State offered no other evidence to prove the victim's unavailability, and the trial court made no findings of fact or conclusions of law regarding unavailability.

Officer Conerly testified that he was the Chief of Police in Newton Grove in 1998 when he received a call about a robbery. Officer Conerly stated that he investigated the crime and took a statement from Jose Gasca, the victim, regarding the robbery. The statement provided:

> He [Gasca] stated that he was in West Hunting and Fishing. That he had seven hundred dollars, I believe he was sending back to his sister in Mexico. That someone ran up behind him and pushed and shoved him, grabbed his money. That he chased them outside. That they jumped into a vehicle and had taken off, and that he was struggling with the fella who was getting in the vehicle. That he cut him with what he thought was a knife.

In *Crawford v. Washington*, —— U.S. ——, 158 L. Ed. 2d 177 (2004), the United States Supreme Court overruled *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597 (1980), and held the Confrontation Clause bars out-of-court testimony by a witness unless the witness

was unavailable and the defendant had a prior opportunity to cross-examine him, regardless of whether the trial court deems the statements reliable. In *Crawford*, the Court held:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." . . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Id.* at ——, 158 L. Ed. 2d at 199.

Here, the State presented Gasca's statement relating details of the robbery through the testimony of Officer Conerly. The only evidence of Gasca's unavailability was the State's assertion. The State presented no evidence of the efforts it took to procure Gasca beyond stating that it had "pulled the record" and found that Gasca had left the state. "[O]nce the [S]tate decides to present the testimony of a witness to a capital sentencing jury, the Confrontation Clause requires the [S]tate to undertake good-faith efforts to secure the 'better evidence' of live testimony before resorting to the 'weaker substitute' of former testimony." *State v. Nobles*, 357 N.C. 433, 441, 584 S.E.2d 765, 771 (2003) (quoting *United States v. Inadi*, 475 U.S. 387, 394-95, 89 L. Ed. 2d 390, 398 (1986)). The evidence presented by the State of its efforts to find Gasca does not amount to the "good-faith efforts" required by *Nobles*.

Further, the admission of Gasca's statement by Officer Conerly violates the cross-examination requirements of *Crawford*. "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*,—— U.S. at ——, 158 L. Ed. 2d at 203. In *Crawford*, the Supreme Court failed to spell out a comprehensive definition of "testimonial" but stated, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The Court also declined to define "police interrogation" and stated in footnote four: "Just as various definitions of 'testimonial' exist, one can imagine various definitions of 'interro-

gation,' and we need not select among them in this case." *Id.* at ——— n.4, 158 L. Ed. 2d at 194 n.4. A witness's "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." *Id.*

Here, the statement made by Gasca was in response to structured police questioning by Officer Conerly regarding the details of the robbery committed by defendant. There can be no doubt that this statement was made to further Officer Conerly's investigation of the crime. Gasca's statement contributed to defendant's arrest and conviction of common-law robbery. Therefore, Gasca's statement is testimonial in nature, triggering the requirement of cross-examination set forth by *Crawford.*

The record is devoid of evidence that defendant had a prior opportunity to cross-examine Gasca at any point before Gasca's statement was introduced into evidence through the testimony of Officer Conerly. Therefore, the trial court erred in allowing the State to introduce Gasca's statement through Officer Conerly.

We now turn our attention to whether the trial court's error prejudiced defendant. Because this error is one with constitutional implications, the State bears the burden of proving that the error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b). One way the State may meet its burden is by showing that there is overwhelming evidence of defendant's guilt. *State v. Autry*, 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988).

At trial, Officer Conerly first read defendant's statement admitting to committing the robbery against Gasca. Officer Conerly then proceeded to read into evidence Gasca's statement that he was robbed and cut by defendant. The substance of Gasca's statement was already in evidence, based on defendant's own statement and Officer Conerly's observations. Defendant's cross-examination of Officer Conerly further confirmed that not only did defendant confess to committing the crime, but that defendant thereafter pled guilty to common-law robbery. Defendant contends that he was prejudiced because Gasca's statement was the only evidence that the robbery was violent and that without this statement the jury may have rejected this aggravating circumstance. We disagree.

The aggravating circumstance of committing a prior crime of violence can be found if the defendant has been previously convicted of a felony involving the use or threat of violence to a person, not just the use of violence. Here, the indictment and judgment presented into

**STATE v. BELL**

[359 N.C. 1 (2004)]

evidence show that defendant pled guilty to common-law robbery. The elements of common-law robbery are " ' "the felonious, non-consensual taking of money or personal property from the person or presence of another by means of violence or fear." *State v. Smith*, 305 N.C. 691, 700, 292 S.E.2d 264, 270, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982).' " *State v. Moss*, 332 N.C. 65, 72, 418 S.E.2d 213, 217 (1992) (quoting *State v. Herring*, 322 N.C. 733, 739-40, 370 S.E.2d 363, 368 (1988)). Therefore, defendant's guilty plea to common-law robbery was an admission of the commission of a felony involving the use or threat of violence even without the erroneous admission of Gasca's statement that defendant robbed him and cut him with a knife. Since defendant's plea of guilty to common-law robbery sufficiently established the aggravating circumstance in and of itself, the trial court's erroneous admission of Gasca's statement is harmless error beyond a reasonable doubt. This assignment of error is overruled.

**[13]** Defendant's eleventh assignment of error is that the trial court erred in overruling defendant's objection to the submission of the (f)(1) statutory mitigating circumstance that he had no significant prior criminal history.

During the charge conference portion of the sentencing proceeding, the trial court stated its intention to submit the (f)(1) mitigating circumstance for the jury's consideration. Defendant objected and requested that the jury be instructed that defendant objected to the submission of this mitigating circumstance and that the submission was required by law. The trial court granted defendant's request. At sentencing, the trial court instructed the jury on the mitigating circumstance and made it clear that defendant had not requested it. The trial court listed defendant's prior crimes, which included felony possession of stolen goods, felony common-law robbery, misdemeanor possession of stolen goods, misdemeanor larceny, misdemeanor communicating a threat, use of alcohol while under age, and use of illegal drugs. Defendant also informed the jury that he had not requested the instruction and that it was required by law.

Defendant argues that because he specifically objected to the submission of the mitigating circumstance and because no rational jury could have found it from the evidence presented at trial, the trial court erred in submitting it to the jury. We disagree.

"The test governing the decision to submit the (f)(1) mitigator is 'whether a rational jury could conclude that defendant had

no *significant* history of prior criminal activity.' If so, the trial court has no discretion; the statutory mitigating circumstance must be submitted to the jury, without regard to the wishes of the State or the defendant."

*State v. White*, 343 N.C. 378, 394-95, 471 S.E.2d 593, 602-03 (quoting *State v. Walker*, 343 N.C. 216, 223, 469 S.E.2d 919, 922, *cert. denied*, 519 U.S. 901, 136 L. Ed. 2d 180 (1996)), *cert. denied*, 519 U.S. 936, 136 L. Ed. 2d 229 (1996) (internal citations omitted). The circumstance under consideration here is after all a statutory mitigating circumstance which, if found, must be taken as having value to defendant. Any reasonable doubt regarding whether to submit a mitigating circumstance must be resolved in favor of a defendant. *State v. Smith*, 347 N.C. 453, 469, 496 S.E.2d 357, 366-67, *cert. denied*, 525 U.S. 845, 142 L. Ed. 2d 91 (1998). The trial court should focus on " 'whether the criminal activity is such as to influence the jury's sentencing recommendation' " in determining if a defendant's history is "significant." *State v. Blakeney,* 352 N.C. 287, 319, 531 S.E.2d 799, 821 (2000) (quoting *State v. Greene*, 351 N.C. 562, 569, 528 S.E.2d 575, 580, *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000)), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). The nature and age of a defendant's criminal activities are important to the trial court's analysis of whether a rational juror could reasonably find the "no significant history of prior activity" mitigating circumstance. *State v. Jones*, 346 N.C. 704, 716, 487 S.E.2d 714, 721 (1997). However, " 'the mere number of criminal activities is not dispositive.' " *Id.* (quoting *State v. Geddie*, 345 N.C. 73, 102, 478 S.E.2d 146, 161 (1996), *cert. denied*, 522 U.S. 825, 139 L. Ed. 2d 43 (1997)).

Here, the trial court properly submitted the (f)(1) mitigating circumstance because a rational jury could have found from the evidence submitted that defendant had no *significant* history of prior criminal activity. Most of defendant's prior convictions were crimes against property. Defendant had been convicted of common-law robbery but had not repeatedly engaged in threatening or violent behavior beyond that one conviction. Defendant's convictions for use of drugs and alcohol, while prior convictions, were not significant enough to keep this mitigating circumstance from the jury. These same convictions were used to support two other mitigating circumstances. Defendant received no active prison time for any of his prior convictions, and although defendant's history was fairly recent, numerous mitigating circumstances based on his age and family history were presented for the jury to consider when viewing his crimi-

nal history. In light of these circumstances, the trial court did not err in determining that a rational juror could have reasonably found the mitigating circumstance that defendant had no significant history of prior criminal activity.

Even assuming *arguendo* that the trial court erred in submitting the (f)(1) mitigating circumstance to the jury, this Court has held that " '[a]bsent extraordinary facts . . . , the erroneous submission of a mitigating circumstance is harmless.' " *State v. Bone*, 354 N.C. 1, 16, 550 S.E.2d 482, 492, (2001) (quoting *Walker*, 343 N.C. at 223, 469 S.E.2d at 923), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231 (2002).

Defendant contends that extraordinary facts are presented when the trial court submits the (f)(1) (no significant history of criminal activity) mitigating circumstance and the State also relies on the (e)(3) aggravating circumstance (a prior conviction for a crime involving violence to another person). "This Court has repeatedly upheld submission of the (f)(1) mitigating circumstance in cases where the (e)(3) aggravating circumstance was submitted to the jury." *Blakeney*, 352 N.C. at 319, 531 S.E.2d at 821; *see also State v. Ball*, 344 N.C. 290, 310-11, 313, 474 S.E.2d 345, 357, 359 (1996), *cert. denied*, 520 U.S. 1180, 137 L. Ed. 2d 561 (1997); *Walker*, 343 N.C. at 224-26, 469 S.E.2d at 923-24; *State v. Brown*, 315 N.C. 40, 61-63, 337 S.E.2d 808, 824-25 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

Defendant also contends that because the prosecutor argued to the jury that it should reject the (f)(1) mitigating circumstance, the mitigating circumstance was effectively turned into an aggravating circumstance. We disagree.

In *Walker*, this Court examined the issue of a prosecutor's conduct in addressing the jury regarding the (f)(1) mitigating circumstance when defendant had specifically objected to its submission. The Court stated that:

> [P]rosecutors must not argue to the jury that a defendant has requested that a particular mitigating circumstance be submitted or has sought to have the jury find that circumstance, when the defendant has in fact objected to the submission of that particular mitigating circumstance. Additionally, the better practice when a defendant has objected to the submission of a particular mitigating circumstance is for the trial court to instruct the jury

that the defendant did not request that the mitigating circumstance be submitted. In such instances, the trial court also should inform the jury that the submission of the mitigating circumstance is required as a matter of law because there is some evidence from which the jury could, but is not required to, find the mitigating circumstance to exist.

*Walker*, 343 N.C. at 223-24, 469 S.E.2d at 923. Here, the prosecutor never argued to the jury that defendant had requested the (f)(1) mitigating circumstance. All the prosecutor did was explain to the jury why it should reject the mitigating circumstance. Further, the trial court specifically instructed the jury that defendant did not request the mitigating circumstance and that the trial court was required by law to give the instruction. Defendant also explained to the jury that he had not requested the mitigating circumstance.

Defendant has failed to show that the trial court erred in submitting the (f)(1) mitigating circumstance to the jury or that the prosecutor's actions in addressing the jury regarding the mitigating circumstance were error. But, even if the trial court had erred in submitting the mitigating circumstance to the jury, defendant has failed to show that extraordinary circumstances exist which would cause the error to be prejudicial to defendant. This assignment of error is overruled.

[14] Defendant's twelfth assignment of error is that the trial court erred in denying defendant's request to instruct the jury, throughout its sentencing instructions to the jury, that "life imprisonment" meant "life in prison without parole."

During the charge conference, defendant's codefendant requested that the trial court continuously define the term "life imprisonment" as meaning "life without parole." Defendant joined in this request. The trial court denied the request and relied on the pattern jury instructions. Defendant also requested that the trial court modify the verdict sheet to reflect "life without parole." This request was denied as well.

Section 15A-2002 of the General Statutes states: "The judge shall instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002 (2003). This Court has held that when a trial court instructs the jury pursuant to N.C.G.S. § 15A-2002, the trial court has no duty to inform the jury "that a life sentence

means life without parole every time [it] mention[s] a life sentence." *State v. Bonnett*, 348 N.C. 417, 448-49, 502 S.E.2d 563, 584 (1998), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999); *see also Davis*, 353 N.C. at 40-41, 539 S.E.2d at 269 ("We find nothing in the statute that requires the judge to state 'life imprisonment without parole' every time he alludes to or mentions the alternative sentence.").

Here, the jurors twice heard the term "life without parole" as one of the two sentencing alternatives in the trial court's preliminary instructions during jury *voir dire*. The jurors were questioned during *voir dire* with the term "life without parole" used numerous times as one of the sentencing alternatives. One juror even demonstrated an understanding of what the term meant under questioning by defendant as to what life imprisonment meant by stating, "I meant life in prison without any chance of getting out." Further, during closing arguments, the State and defense counsel frequently referred to "life without parole."

The trial court began sentencing phase instructions by saying:

> Members of the Jury, having found the defendants Antwaun Kyral Sims and Bryan Christopher Bell guilty of murder in the first degree, it is now your duty to recommend to the Court whether each defendant should be sentenced to death or life imprisonment. *A sentence of life imprisonment means a sentence of life without parole.* The Court has allowed the defendants' cases to be joined for this sentencing hearing. Even though the defendants are joined for this sentencing hearing, you must determine the sentence of each defendant individually.

(Emphasis added.) After this instruction, the trial court used the term "life imprisonment." Based on this instruction, the trial court instructed the jury in accordance with N.C.G.S. § 15A-2002 and with corresponding case law that a "sentence of life imprisonment means a sentence of life without parole." This instruction, in conjunction with the jury *voir dire* and the closing arguments of the parties in which the term "life without parole" was used numerous times, makes it clear that the jurors had no reasonable basis for misunderstanding the meaning of the term "life imprisonment."

[15] Defendant also contends that the trial court erred by submitting the "Issues and Recommendation as to Punishment" form to the jury with sentencing alternatives of "death" or "life imprisonment" instead of "death" or "life imprisonment without parole." We disagree.

This Court has previously held that the "Issues and Recommendation as to Punishment" form need not describe the punishment as "life imprisonment without parole" when the trial court instructs the jury that life imprisonment means life without parole. *State v. Gainey*, 355 N.C. 73, 110-11, 558 S.E.2d 463, 487, *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165 (2002). The trial court's instructions regarding life imprisonment were in accordance with N.C.G.S. § 15A-2002, and the jurors were informed numerous times as to the meaning of "life imprisonment." Defendant's assignment of error on this issue is overruled.

**[16]** Defendant's thirteenth assignment of error is that the trial court erred by failing to intervene and censor the prosecutor's sentencing proceeding closing argument when each juror was called upon by name to impose a sentence of death. Defendant argues that the prosecutor improperly appealed to the emotions of the jurors. Defendant concedes that he failed to object to this argument and therefore this Court is limited to reviewing this issue to determine whether the conduct was so grossly improper that the trial court erred in failing to intervene *ex mero motu* to correct the error. *State v. Sexton*, 336 N.C. 321, 348-49, 444 S.E.2d 879, 894-95, *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). "[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).

This Court has previously considered this issue and ruled against defendant's position. *See State v. Wynne*, 329 N.C. 507, 524-25, 406 S.E.2d 812, 821 (1991). Just as in those cases, the prosecutor here did not improperly appeal to the jurors' emotions when asking them to impose the death penalty. Rather, the prosecutor was reminding the jurors that they had earlier averred that they could and would follow the law if the State proved what was required to impose the death penalty. "[T]he prosecutor in a capital case has a duty to strenuously pursue the goal of persuading the jury that the facts of the particular case at hand warrant imposition of the death penalty." *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Here, the prosecutor did nothing more than argue to the jurors that the State had proven its case and that the jurors should now impose the death penalty.

This argument is of a different nature than a defendant's emotional appeal to each individual juror to spare his life. *See State v. Holden*, 321 N.C. 125, 163, 362 S.E.2d 513, 536-37 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). A defendant's argument to each juror individually to spare his life is not based on the evidence presented at trial or the reasonable inferences that could be taken from it. *Id.* Defendant has failed to show that the prosecutor's sentencing arguments were grossly improper and that the trial court abused its discretion in failing to intervene *ex mero motu*. This assignment of error is overruled.

**[17]** Defendant's fourteenth assignment of error is that the trial court erred in submitting the death penalty to the jury as a potential punishment because the death penalty violates provisions of the International Covenant on Civil and Political Rights, which this country ratified on 8 September 1992. We first note that defendant failed to make this objection before the trial court and has not properly preserved this issue for appellate review. Beyond that, this Court has previously considered, and affirmed, the constitutionality of our death penalty against the backdrop of the International Covenant on Civil and Political Rights. *See Williams*, 355 N.C. at 586, 565 S.E.2d at 658; *State v. Smith*, 352 N.C. 531, 566, 532 S.E.2d 773, 795 (2000), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001). We see no reason to depart from our previous holdings in this regard. This assignment of error is overruled.

Defendant's fifteenth assignment of error is that the trial court erred in submitting the aggravating circumstance that this murder was especially heinous, atrocious, or cruel. Defendant first argues that N.C.G.S. § 15A-2000(e)(9) is unconstitutionally vague. However, we have previously considered and rejected this argument. *See e.g., State v. Garcia*, 358 N.C. 382, 424, 597 S.E.2d 724, 753 (2004); *State v. Roache*, 358 N.C. 243, 327, 595 S.E.2d 381, 434 (2004); *State v. Miller*, 357 N.C. 583, 601, 588 S.E.2d 857, 869 (2003), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 72 U.S.L.W. 3768 (2004); *State v. Haselden*, 357 N.C. 1, 26, 577 S.E.2d 594, 610, *cert. denied*, —— U.S. ——, 157 L. Ed. 2d 382 (2003). We see no reason to depart from our previous holdings as to this issue.

**[18]** Defendant additionally argues that the trial court erred in submitting the (e)(9) aggravating circumstance because it was unsupported by the evidence. We disagree.

We have previously identified three types of murders which warrant submission of the (e)(9) aggravating circumstance. *See State v. Gibbs*, 335 N.C. 1, 61-62, 436 S.E.2d 321, 356 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). One type includes those killings that are physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *judgment vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988). Another type includes those killings involving psychological torture where the victim is left to her "last moments aware of but helpless to prevent impending death." *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). The final type includes those killings that "demonstrate[] an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown*, 315 N.C. at 65, 337 S.E.2d at 827.

When determining whether it is proper to submit the (e)(9) aggravating circumstance, evidence must be considered in the light most favorable to the State and every reasonable inference must be drawn in its favor. *State v. Flippen*, 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999).

In the present case, the victim, an eighty-nine year old woman, was kidnapped from her own home, repeatedly beaten, and placed in the trunk of her own car to await most certain death. The victim fought to free herself from the trunk of her car, only to have the trunk lid repeatedly slammed down upon her. The victim was trapped in her car for hours, helpless and obviously in fear for her life. She struggled and fought for her life, ultimately losing the fight and dying alone in the trunk of her own car, which defendant had set on fire.

After reviewing the evidence presented at trial, in the light most favorable to the State, we conclude that there was substantial evidence for the jury to conclude that the victim was subjected to both physical and psychological torture beyond that present in most first-degree murders. Therefore, the trial court did not err in submitting the (e)(9) aggravating circumstance. This assignment of error is overruled.

Defendant's sixteenth assignment of error is that the trial court erred in failing to dismiss defendant's murder indictment because the indictment failed to specifically allege each element of first-degree murder. This Court has repeatedly held contrary to defendant's position. *See State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, 539

U.S. 985, 156 L. Ed. 2d 702 (2003); *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). We have considered defendant's argument on this issue and find no reason to depart from our previous holdings. This assignment of error is overruled.

Defendant's seventeenth assignment of error is that the trial court committed plain error by instructing the jury, according to the pattern jury instructions, that unanimity was required for any answer to Issues I, III, and IV on the "Issues and Recommendation as to Punishment" form. As to Issue I, the trial court instructed the jury that it must be unanimous in its findings regarding the existence of aggravating circumstances. As to Issue III, the trial court instructed the jury that it must be unanimous in its decision as to whether the mitigating circumstances found were insufficient to outweigh the aggravating circumstances found by the jury. Finally, as to Issue IV, the trial court instructed the jury that if it unanimously determined that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, it must then be unanimous in its decision as to whether the aggravating circumstances were sufficient to impose the death penalty. This Court has previously considered arguments regarding these jury instructions and has held contrary to defendant's position. *See State v. DeCastro*, 342 N.C. 667, 467 S.E.2d 653, *cert. denied*, 519 U.S. 896, 136 L. Ed. 2d 170 (1996); *State v. McLaughlin*, 341 N.C. 426, 462 S.E.2d 1 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996); *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). We have considered defendant's argument on this issue and find no reason to depart from our previous holdings. This assignment of error is overruled.

Defendant's eighteenth assignment of error is that the trial court erred by instructing the jury, according to the pattern jury instructions, that it had a duty to recommend a death sentence if it determined that mitigating circumstances were insufficient to outweigh aggravating circumstances and that the aggravating circumstances were sufficiently substantial to warrant the death penalty. This Court has previously held the pattern jury instruction at issue to be constitutional. *See State v. Skipper*, 337 N.C. 1, 57, 446 S.E.2d 252, 283 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995); *State v. McDougall*, 308 N.C. 1, 26, 301 S.E.2d 308, 323-24, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). We have considered defendant's

argument and see no reason to depart from our previous holdings. This assignment of error is overruled.

Defendant's nineteenth assignment of error is that the trial court erred by instructing the jury regarding defendant's burden of proof on mitigating circumstances and argues that the instruction was unconstitutionally vague due to the use of the term "satisfy." This Court has previously considered this argument and held contrary to defendant's position. *See State v. Payne*, 337 N.C. 505, 532-33, 448 S.E.2d 93, 109 (1994), *cert. denied*, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995); *Skipper*, 337 N.C. at 58, 446 S.E.2d at 284. We have considered defendant's argument and see no reason to depart from our prior holdings. This assignment of error is overruled.

Defendant's twentieth assignment of error is that the trial court erred by instructing the jury that it was to determine whether factually proven nonstatutory mitigating circumstances had actual mitigating value. Defendant contends that such an instruction allows the jury to refuse to consider mitigating evidence in violation of the constitutional requirement that a sentencer consider and give effect to all mitigating evidence. However, nonstatutory mitigating circumstances, in and of themselves, do not have mitigating value as a matter of law. *State v. Lee*, 335 N.C. 244, 292, 439 S.E.2d 547, 572, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). This Court has previously held that such an instruction to the jury does not violate the Constitution. *See State v. Robinson*, 336 N.C. 78, 117-18, 443 S.E.2d 306, 325 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995); *State v. Hill*, 331 N.C. 387, 417-18, 417 S.E.2d 765, 780 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993). We have considered defendant's argument on this issue and see no reason to depart from our earlier holdings. This assignment of error is overruled.

Defendant's twenty-first assignment of error is that the trial court erred by instructing the jury, according to the pattern jury instructions, on a definition of aggravation that was unconstitutionally broad. This Court has previously considered this issue and ruled against defendant's position. *See Lee*, 335 N.C. at 288-89, 439 S.E.2d at 570-71; *State v. Hutchins*, 303 N.C. 321, 350-51, 279 S.E.2d 788, 806-07 (1981). We have considered defendant's argument and see no reason to depart from our earlier holdings. This assignment of error is overruled.

Defendant's twenty-second assignment of error is that the trial court erred in instructing the jury as to Issues III and IV on the "Issues

and Recommendation as to Punishment" form that each juror "may" consider mitigating circumstances found to exist in Issue II. Defendant argues that these instructions made consideration of proven mitigation discretionary rather than mandatory. This Court has previously ruled that such instructions are not erroneous. *See Gregory,* 340 N.C. at 418-19, 459 S.E.2d at 668-69; *Lee,* 335 N.C. at 286-87, 439 S.E.2d at 569-70. We have considered defendant's arguments and see no reason to depart from our prior holdings. This assignment of error is overruled.

Defendant's twenty-third assignment of error is that the trial court erred by instructing the jury that each juror could only consider at Issues III and IV the mitigating circumstances which that particular juror had found at Issue II. Defendant argues that this instruction unconstitutionally precluded the full and free consideration of mitigating evidence. This Court has previously considered this argument and ruled against defendant's position. *See Robinson,* 336 N.C. at 120-21, 443 S.E.2d at 326-27; *Lee,* 335 N.C. at 287, 439 S.E.2d at 569-70. We have considered defendant's arguments and see no reason to depart from our prior holdings. This assignment of error is overruled.

Defendant's twenty-fourth assignment of error is that the North Carolina death penalty statute is vague and overly broad, unconstitutionally applied, and cruel and unusual punishment. This Court has consistently held that North Carolina's capital sentencing statute, N.C.G.S. § 15A-2000, is constitutional on its face and as applied. *See State v. McKoy,* 327 N.C. 31, 394 S.E.2d 426 (1990); *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We have reviewed defendant's arguments and find no reason to depart from our prior holdings. This assignment of error is overruled.

[19] Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we must now review the record and determine: (1) whether the evidence supports the aggravating circumstances found by the jury and upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2003).

After a thorough review of the record on appeal, briefs, and oral arguments of counsel, we conclude that the evidence fully supports

the aggravating circumstances found by the jury. Additionally, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

We conduct a proportionality review "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *Holden*, 321 N.C. at 164-65, 362 S.E.2d at 537. In doing so, we must look at both the defendant and the crime. *State v. Watts*, 357 N.C. 366, 379, 584 S.E.2d 740, 750 (2003), *cert. denied*, —— U.S. ——, 158 L. Ed. 2d 370 (2004). In the present case, defendant was found guilty of first-degree murder, first-degree kidnapping, and burning of personal property. Following a capital sentencing proceeding, the jury found the existence of five aggravating circumstances: (1) defendant had been previously convicted of a felony involving the use or threat of violence, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed for the purpose of avoiding lawful arrest, N.C.G.S. § 15A-2000(e)(4); (3) the murder was committed while defendant was engaged in the commission of a first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); (4) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (5) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The trial court submitted five statutory mitigating circumstances to the jury, including the "catchall" statutory mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). However, the jury found only two statutory mitigating circumstances to exist: that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7). The trial court additionally submitted ten nonstatutory mitigating circumstances, of which the jury found six to exist: (1) a lack of adequate role modeling during defendant's formative years contributed to defendant's acceptance of peer pressure in forming his opinions and shaping his behavior; (2) defendant was intoxicated, reducing his ability to make appropriate judgments; (3) defendant has a desire to correct his deficiencies and make a positive contribution to society in the future; (4) defendant was negatively affected as a young teen by the family trauma caused by his father; (5) defendant had a chaotic and unstable home life lacking in parental guidance; and (6) defendant changed and began acting tough when his father entered into his life.

STATE v. BELL

[359 N.C. 1 (2004)]

We begin our proportionality review by comparing this case to the eight cases where this Court has determined the sentence of death to be disproportionate. *See State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), and by *Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). After careful review, we conclude that this case is not substantially similar to any case in which this Court has previously found the death penalty disproportionate.

In conducting a proportionality review, we must also compare this case with prior cases where this Court has found the death penalty to be proportionate. *Haselden*, 357 N.C. at 31, 577 S.E.2d at 613. First, defendant was convicted on the basis of malice, premeditation and deliberation and under the felony murder rule. " 'The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime.' " *Id.* at 30, 577 S.E.2d at 612 (quoting *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990)). This Court has repeatedly noted that " 'a finding of first-degree murder based on theories of premeditation and deliberation and of felony murder is significant.' " *State v. Carroll*, 356 N.C. 526, 554-55, 573 S.E.2d 899, 917 (2002) (quoting *Bone*, 354 N.C. at 22, 550 S.E.2d at 495), *cert. denied*, 539 U.S. 949, 156 L. Ed. 2d 640 (2003).

Further, defendant was convicted of two additional crimes against the victim: first-degree kidnapping and burning of personal property. The jury found five aggravating circumstances in this case, including that the murder was committed during the commission of a first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). This Court has previously determined that the (e)(5) and (e)(9) aggravating circumstances are sufficient, standing alone, to sustain a death sentence. *See Haselden*, 357 N.C. at 30, 577 S.E.2d at 612; *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

Upon comparison of the present case with those in which we have previously conducted a proportionality review, we conclude that

this case is more similar to cases in which this Court has found the sentence of death proportionate than to those in which this Court has found the sentence of death disproportionate.

The inquiry into proportionality does not, however, end here. The similarities between this case and prior cases in which a sentence of death was found proportionate "merely serves as an initial point of inquiry." *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). The final decision of whether a death sentence is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. Therefore, having thoroughly reviewed the entire record in this matter, and based upon the characteristics of defendant and his crime, we cannot conclude as a matter of law that the sentence of death in this case is disproportionate or excessive.

Accordingly, we hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.