IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-124

No. 284PA20

Filed 29 October 2021

STATE OF NORTH CAROLINA

v.

JEREMY WADE DEW

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 270 N.C. App. 458, 462 (2020), finding no error after appeal from judgments entered on 7 February 2018 by Judge John E. Nobles Jr. in Superior Court, Carteret County. Heard in the Supreme Court on 24 March 2021.

*Joshua H. Stein, Attorney General, by Wes Saunders, Assistant Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Daniel Shatz, Assistant Appellate Defender, for the defendant-appellant.*

HUDSON, Justice.

¶ 1   Here we must determine whether there is sufficient evidence, in the light most favorable to the State, that defendant committed multiple assaults against his girlfriend when the testimony tended to show that he beat her in her family's trailer and also in her car as they traveled home. Because we conclude that there was sufficient evidence of multiple assaults to submit the issue to the jury, we hold that the trial court did not err by denying defendant's motion to dismiss all but one assault

charge.

## I.    Factual and Procedural Background

In 2016, Mindy Ray Davis and defendant Jeremy Wade Dew were in a relationship and living together in Sims, North Carolina. On 29 July 2016, Davis and defendant drove to Atlantic Beach with defendant's four-year-old daughter to spend the weekend with Davis's parents who owned a trailer there. Both Davis and defendant testified at trial, but gave different accounts of the events that occurred between 29 July and 31 July 2016.

The following is a summary of Davis's account: On 30 July 2016, defendant, Davis, and defendant's daughter spent the evening outside socializing with neighbors. Davis testified that around 9:00 p.m., she took defendant's daughter back inside the trailer to put her to bed. The trailer had three bedrooms. The bedroom at the front of the trailer where defendant and Davis stayed was separated from the other two bedrooms by the communal living spaces. Davis stayed with defendant's daughter until she fell asleep on the couch in the living room around 9:30 p.m. or 9:45 p.m.

When Davis went back outside, she and defendant went a few trailers over to hang out with her cousin from Virginia. According to her testimony, Davis danced with her cousin and defendant's "whole demeanor changed." Defendant left the trailer and got in the car, drove down the street of the trailer park, drove back, and

ultimately went inside the trailer he was staying in with Davis and locked Davis out. After Davis called defendant's phone several times and knocked on the window of the trailer, defendant let her into the trailer.

¶ 5        Once inside, Davis walked to the bedroom at the front of the trailer to change into clothing to sleep in. Davis testified that defendant "just hauled off and hit [her] upside the head." She testified that defendant hit her "over and over,"—a continuous, nonstop beating—for at least two hours. Specifically, defendant hit her "upside the head and ear, on each side," "kicked [her] in the chest," bit her nose and her ear, "punched [her] in the nose," "head-butted [her] twice," and "strangled [her] until vomiting." She recounted that during the attack defendant called her a "slut" and told her that she embarrassed him and that she was making him do this.

¶ 6        Davis testified that she did not fight him back because she was too scared and had never been through anything like that before. Defendant also threatened to throw her in the Buckhorn Reservoir if Davis said anything to defendant's ex-wife and told Davis he could be the next "Tick Bailey," a reference to a man who killed his ex-wife. Davis testified that defendant told her if she made any noise, he would kill everyone in the trailer.

¶ 7        When the beating was over, defendant said "[w]e're leaving and we're going home." He made Davis take the sheets off the bed, which were stained with her blood, and clean the mattress cover. Davis wiped down the mattress cover and took the

sheets off the bed and put them on the dresser. Davis grabbed their bags and took them out to the car. At that point, defendant went to get his daughter off the couch and made Davis get into the driver's seat of the car. He then changed his mind and made Davis get into the passenger's seat. Defendant put his daughter in the backseat of the car.

¶ 8        Davis testified that during the entire car ride back to Sims defendant hit her on the side of her head where she ultimately ended up with a ruptured eardrum. Defendant pulled off the road several times, reached over and was "jacking [her] up to the ceiling of the car, strangling [her]." Davis estimated that three times defendant made her take off her seat belt and open the door, and told her that he was going to push her out. Defendant also threw Davis's phone out of the window of the car.

¶ 9        They arrived in Sims approximately two hours after they left Atlantic Beach. When they arrived, defendant told Davis that if she called the police or went to stay with her sister, he would cut himself with a knife and say that she did it so that she would have to go to jail. Davis testified that she believed defendant because she thought he was "crazy enough to do something like that." The next morning, Davis's sister came to the house and called 911.

¶ 10        The parties stipulated that Davis suffered a concussion, a ruptured eardrum, and a nondisplaced nose fracture. She underwent two surgeries to save her hearing due to the ruptured eardrum.

¶ 11     Defendant also testified at trial. According to defendant, sometime after dinner on 30 July 2016, he and Davis went to a party a few trailers down from Davis's parents' trailer. They were at the party for about an hour and a half, and defendant went back to the trailer to check on his daughter every once in a while.

¶ 12     One time after checking on his daughter, defendant returned to find Davis "with another man." Defendant testified that he felt "disgusted," "angry," "[h]urt," and "[e]mbarrassed." He went back to the trailer and debated calling his parents to pick him and his daughter up, but decided not to. Defendant did not remember locking the trailer door, but he received a text from Davis that said she was locked out, so defendant unlocked the door for her, and she came inside. According to defendant, Davis tried to frantically explain the situation while defendant began packing up his things to leave.

¶ 13     Defendant testified that when he bent over to get his cell phone charger, Davis came up behind him, bit him on his left shoulder, wrapped her nails around him, and hit him. In response, defendant bucked his head back "pretty hard" into her head "[t]o get her off" of him three or four times. Defendant and Davis fell face first on the floor, and there was a tussle to get up. Defendant testified that the whole episode lasted about two minutes. Afterwards, he said they both calmed down and went out onto the porch to smoke a cigarette together. Defendant denied biting Davis on the nose or the ear but acknowledged that his head hit her in the nose. He denied beating Davis for

two hours in the trailer and for two hours on the ride home. He also testified that he did not know what happened to her phone.

¶ 14    Defendant testified that it was Davis's idea to go home that night. Defendant got his daughter and put her in the car seat in the back seat of the car while Davis was in the driver's seat warming up the car. According to defendant, Davis drove the whole way home and they just listened to the radio. When they arrived at the house in Sims, defendant put his daughter in bed and defendant and Davis went to sleep in the same bed. Defendant testified that the next morning Davis's sister came over and was "screaming and hollering." Defendant put his daughter in his car and drove to his parents' house.

¶ 15    On 1 August 2016, defendant was arrested. The defendant went to trial on the following five bills of information in which he was charged with the following seven offenses:

| 16CRS53232 | First-degree kidnapping |
|---|---|
| 16CRS53233 | 1 – Assault by strangulation<br>2 – Assault with a deadly weapon inflicting serious injury through fists and hands resulting in a ruptured eardrum |
| 16CRS53234 | Assault on a female through a kick to the head |
| 16CRS53235 | Assault on a female through a headbutt to the forehead |
| 16CRS53236 | 1 – Assault with a deadly weapon inflicting serious injury through fists, hands, and teeth resulting in a fractured nose<br>2 – Communicating threats |

The trial began 5 February 2018, and the jury convicted defendant on all charges except two: the assault by strangulation, and assault on a female by kick to the chest. The trial court entered a consolidated judgment in sentencing defendant to a minimum of 75 months and a maximum of 102 months in prison. Defendant appealed to the Court of Appeals.

The Court of Appeals found no error. Defendant filed a petition for discretionary review, which we allowed on 12 August 2020.

## II.     Issues Presented for Review

On discretionary review, defendant raises two issues: (1) whether there was insufficient evidence of multiple assaults such that the trial court erred by denying defendant's motion to dismiss all but one assault charge; and (2) whether there was sufficient evidence to establish that defendant used his hands, feet, or teeth as deadly weapons. As to the second issue, the members of the Court are equally divided. Accordingly, the decision of the Court of Appeals as to this issue stands as law of this case without precedential value and we spend the remainder of this opinion discussing only the first issue presented. *See, e.g., Piro v. McKeever*, 369 N.C. 291, 291 (2016) (per curiam) (affirming a Court of Appeals opinion without precedential value by an equally divided vote); *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 56 (2016) (same).

### III. Preservation

Defendant moved to dismiss the deadly weapon element of his assault charges at the close of the State's evidence arguing that insufficient evidence was presented to show that his hands could be considered deadly weapons. He renewed his motion at the close of all of the evidence, mentioning that the bills of information did not include the correct dates of the offense. The Court of Appeals held that defendant's failure to argue before the trial court that the evidence established only one assault resulted in a failure to preserve this argument for appellate review. *State v. Dew*, 270 N.C. App. 458, 462 (2020). We disagree.

We recently held in *State v. Golder*, 374 N.C. 238 (2020), that "merely moving to dismiss at the proper time under Rule 10(a)(3) preserves *all* issues related to the sufficiency of the evidence for appellate review." *Id.* at 249. Additionally, in his petition for discretionary review, defendant requested review of the following issue: "[w]hether the Court of Appeals erred by affirming multiple counts of assault where the defendant struck multiple blows, causing multiple injuries, in a single episode." Defendant's motion to dismiss for insufficient evidence preserved all sufficiency issues, and we allowed defendant's petition for discretionary review. Accordingly, the issue of whether the trial court erred by failing to dismiss all but one count of assault is properly before us for consideration.

## IV. Standard of Review

It is well established that

> [w]hen ruling on a motion to dismiss, the trial court must determine whether the prosecution has presented substantial evidence of each essential element of the crime. Substantial evidence is that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. In making its decision, the trial court must view the evidence in the light most favorable to the State.

*State v. Bell*, 359 N.C. 1, 25 (2004) (cleaned up) (first quoting *State v. Call*, 349 N.C. 382, 417 (1998); then quoting *State v. Williams*, 355 N.C. 501, 579 (2002), *cert. denied*, 537 U.S. 1125 (2003); and then quoting *State v. Hyatt*, 355 N.C. 642, 666 (2002), *cert. denied*, 537 U.S. 1133 (2003)).

## V. Analysis

Here, defendant was charged with seven offenses, including five assault charges, and the jury found him guilty of three assault charges, to wit: AWDWISI (No. 53233) with hands/fists resulting in a ruptured eardrum, assault on a female (No. 53233) headbutt to forehead, and AWDWISI (No. 53236) with hands/fists resulting in a fractured nose. The three assault charges for which defendant was found guilty were assault with a deadly weapon inflicting serious injury resulting in the ruptured eardrum, assault on a female in connection with the headbutt to the forehead, and assault with a deadly weapon inflicting serious injury resulting in the fractured nose. Accordingly, we must now examine whether, in the light most

favorable to the State, there was substantial evidence of each essential element of each of these instances of assault on a female or assault inflicting serious injury.[1]

One of the essential elements of both assault on a female and assault with a deadly weapon inflicting serious injury is "an assault." *See* N.C.G.S. § 14-33(c)(2) (2019); N.C.G.S. § 14-32(b) (2019).[2] Here we are asked to determine what exactly constitutes an assault and how a court may determine whether there is substantial evidence of multiple assaults or only a single assault.

"Although our statutes criminalize the act of assault, '[t]here is no statutory definition of assault in North Carolina, and the crime of assault is governed by common law rules.' " *State v. Floyd*, 369 N.C. 329, 335 (2016) (alteration in original)

---

[1] As noted above, the members of this Court are equally divided as to whether there was substantial evidence that defendant's hands, feet, and teeth were used as deadly weapons. Accordingly, we affirm without precedential value the holding of the Court of Appeals that the trial court did not err by denying defendant's motion to dismiss the deadly weapon element of these two counts of assault because the State had presented sufficient evidence that defendant's hands, feet, and teeth were used as deadly weapons. Our analysis of the assault with a deadly weapon inflicting serious injury charges would also be applicable to an analysis of the lesser included offense of assault inflicting serious injury. Therefore, this opinion should not be construed to say conclusively one way or the other whether hands, feet, and teeth are deadly weapons.

[2] We note that the bills of information indicate that defendant was charged under N.C.G.S. § 14-32(a), which provides that "[a]ny person who assaults another person with a deadly weapon with intent to kill and inflicts serious injury shall be punished as a Class C felon." However, the bills of information classify the offense as a Class E felony and do not include the language of intent to kill. Therefore, it may be that defendant was actually charged under N.C.G.S. § 14-32(b), which provides that "[a]ny person who assaults another person with a deadly weapon and inflicts serious injury shall be punished as a Class E felon."

Because our focus is on the first element of the offense, "assault" it makes no difference to our analysis whether defendant was charged under N.C.G.S. § 14-32(a) or N.C.G.S. § 14-32(b). Furthermore, neither party raised this potential discrepancy as an issue at any stage of the litigation.

(citation omitted) (quoting *State v. Roberts*, 270 N.C. 655, 658 (1967)). "This Court generally defines the common law offense of assault as 'an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which show of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm.' " *Roberts*, 270 N.C. at 658 (quoting 1 Strong's North Carolina Index, *Assault and Battery* § 4 (1957)). Black's Law Dictionary defines "assault" as "[t]he threat or use of force on another that causes that person to have a reasonable apprehension of imminent harmful or offensive contact" and "[p]opularly, any attack." *Assault*, Black's Law Dictionary (11th ed. 2019). From these definitions, we gather that assault is a broad concept that can include more than one contact with another person. For example, an "attack" or "show of force" may refer to a single punch but could also refer to a deluge of punches in a single fight and still be called a single assault. We have not found, and the parties have not presented, any evidence or indication that the General Assembly intended for the State to be able to charge someone with a separate assault for every punch thrown in a fight. Indeed, the State made clear in its argument that it did not think it would be appropriate to charge someone for every punch in a fight. Thus, we must look beyond the number of physical contacts with the victim to determine whether more than one assault has occurred such that the State can appropriately charge a defendant with multiple assaults.

¶ 24          The question of how to delineate between assaults—to know where one assault ends and another begins—in order to determine whether the State may charge a defendant with multiple assaults, is an issue of first impression in our Court. The Court of Appeals has analyzed this issue several times. *See, e.g.*, *State v. Brooks*, 138 N.C. App. 185, 190–91 (2000) (holding that the defendant could only be charged with a single count of assault with a deadly weapon inflicting serious injury where there was no evidence of a distinct interruption between three gunshots); *State v. Littlejohn*, 158 N.C. App. 628, 636 (2003) (holding that the defendant could be charged with two counts of assault where the evidence tended to establish that the assaults were distinct in time and inflicted wounds in different parts of the victim's body); *State v. McCoy*, 174 N.C. App. 105 (2005) (holding that the defendant could be charged with two counts of assault where the evidence showed the assaults took place on two different days, but could not be charged with multiple counts of assault arising from a single continuous transaction on one of those days). In brief, the Court of Appeals has required that "[i]n order for a criminal defendant to be charged and convicted of two separate counts of assault stemming from one transaction, the evidence must establish 'a distinct interruption in the original assault followed by a second assault[,]' so that the subsequent assault may be deemed separate and distinct from the first." *Littlejohn*, 158 N.C. App. at 635 (second alteration in original) (quoting *Brooks*, 138 N.C. App. at 189). But it is not always easy to determine when

a "distinct interruption" has occurred.

¶ 25        In some cases, the Court of Appeals has chosen to apply our decision in *State v. Rambert*, 341 N.C. 173 (1995). In *Rambert*, the defendant was charged and convicted of three counts of discharging a firearm into occupied property. *Id.* at 174. The defendant argued on appeal that evidence that he fired three shots into occupied property within a short period of time supported only a single conviction and sentence, not three, for discharging a firearm into occupied property. *Id.* We concluded that "the evidence clearly show[ed] that [the] defendant was not charged three times with the same offense for the same act but was charged for three separate and distinct acts." *Id.* at 176. We noted that (1) the defendant employed his thought processes each time he fired the weapon, (2) each act was distinct in time, and (3) each bullet hit the vehicle in a different place. *Id.* at 177. Accordingly, we determined that each time the defendant discharged his firearm could be charged as a separate offense. *Id.*

¶ 26        Here, the Court of Appeals applied the three factors from *Rambert* to determine whether there was a distinct interruption between assaults. *Dew*, 270 N.C. App. at 462–63. The State argues that we should likewise apply the *Rambert* factors and conclude that multiple assaults occurred on the night in question. Although we appreciate that *Rambert* may be the most closely analogous case from our Court to date, we decline to extend *Rambert* to assault cases generally. *Rambert* resolved an

issue involving the discharge of a firearm, an act which differs from the physical assaults here in important ways. Discharging a firearm means firing a shot; each distinctly fired shot is a separate discharge of a firearm. The same is not true of assault which, as explained above, might refer to a single harmful contact or several harmful contacts within a single incident. Multiple contacts can still be considered a single assault, even though each punch or kick would require a different thought process, would not occur simultaneously, and would land in different places on the victim's body. These two distinct crimes require two distinct analyses. Accordingly, we conclude that the *Rambert* factors are not the ideal analogy for an assault analysis.

¶ 27        We agree with the Court of Appeals that the State may charge a defendant with multiple counts of assault only when there is substantial evidence that a distinct interruption occurred between assaults. Building on the Court of Appeals' jurisprudence, we now take the opportunity to provide examples but not an exclusive list to further explain what can qualify as a distinct interruption: a distinct interruption may take the form of an intervening event, a lapse of time in which a reasonable person could calm down, an interruption in the momentum of the attack, a change in location, or some other clear break delineating the end of one assault and the beginning of another.

¶ 28        Based on the facts here, we think it is important to further explain what does

*not* constitute a distinct interruption. The State's charges here seem to be based on the victim's injuries. But the fact that a victim has multiple, distinct injuries alone is not sufficient evidence of a distinct interruption such that a defendant can be charged with multiple counts of assault. The magnitude of the harm done to the victim can be taken into account during sentencing but does not automatically permit the State to stack charges against a defendant without evidence of a distinct interruption.

¶ 29        Evidence that a defendant used different methods of attack can show a distinct interruption depending on the totality of the circumstances. Here the State has argued that defendant punched and headbutted the victim and that because there was no evidence that these different methods of attack occurred at the exact same time, each method constituted a separate assault. We disagree. As we explained above, the concept of an assault can be broader than each individual harmful contact, but allowing for a separate charge for each non-simultaneous contact would erase any limiting principle and allow the State to charge a defendant for every punch in a fight. Requiring the State's case to include evidence of a "distinct interruption" in an otherwise continuous assault addresses this concern.

¶ 30        The State has tried to justify its analysis by noting that neither defendant in this case nor any of the defendants in cases cited by the parties in their briefs were charged for every blow during their assaults. However, this argument would put the limiting principle fully within the discretion of the State. Regardless of the fact that

the State did not charge a defendant for each blow, the State's argument would leave open the door such that the State *could* charge for each blow. We decline to leave such ambiguity in the law such that the State could, but may choose not to, charge a defendant for every punch thrown in a fight when the legislature has shown no intention to criminalize the conduct at that level of granularity. To do so would be to abdicate our responsibility to interpret the laws passed by the legislature in accordance with their plain meaning and intention. Furthermore, it would abolish any limiting principle and would leave a trial court powerless to determine whether there was sufficient evidence of multiple assaults since evidence of each punch could constitute a separate assault under the State's proposed legal schema.

¶ 31        We now turn to the facts of this case to determine whether there was substantial evidence of more than one assault. In the light most favorable to the State, we conclude that there could be sufficient evidence of a distinct interruption between assault(s) in the trailer and the assault(s) in the car to submit the issue to the jury.

¶ 32        Davis testified to being beaten for approximately four hours total. She testified that in the trailer defendant hit her "over and over" during a continuous, non-stop beating for at least two hours until she vomited. She also testified that she was beaten during the two-hour car ride home to Sims when defendant hit her on the side of her head and pulled off the road several times to strangle her. But Davis also indicated

that there was a distinct interruption between the attack in the trailer and the attack in the car.

¶ 33          After the beating in the trailer, but before defendant began beating Davis in the car, Davis testified that she wiped down the mattress cover and took the sheets off of the bed, that she took their luggage out to the car, and that defendant got his daughter off of the couch and put her in a car seat in the back seat of the car. This is substantial evidence of a distinct interruption between occurrences in the trailer and those in the car. The process of cleaning up and packing up was an intervening event interrupting the momentum of the attack. In addition, the beating in the trailer was distinct in time and location from the beating in the car. The jury could have found that there was a distinct interruption between when the first assault concluded with Davis vomiting on the bed and when defendant resumed his attacks in the car during the drive home.

¶ 34          Defendant draws inferences from Davis's testimony that the entirety of the assault took place in the trailer. But in the light most favorable to the State, the following testimony is substantial evidence that defendant also assaulted Davis in the car:

> We continued on, and as we were on the way home, the whole time he is still hitting me upside this side of my head where I had the ruptured eardrum. He—I remember him pulling off the road, jacking me up to the ceiling of the car, strangling me. There were several times—his arms are long, so he could reach over in my car—he would make me

> take my seat belt off, open the door and tell me he was
> going to push me out.
>
> He pulled off the road several times and continued
> to do that. I think it was about three times with the seat
> belt and he's going to push me out of the car.

Accordingly, we conclude that the jury could find that the beating in the trailer and the beating in the car were distinct assaults.

¶ 35      The State charged defendant with at least two assaults for his conduct in the trailer: assault on a female involving the headbutt to the forehead and assault with a deadly weapon inflicting serious injury resulting in the fractured nose. As noted above, different injuries or different methods of attack standing alone are insufficient evidence of a distinct interruption. The State presented no evidence indicating that a distinct interruption occurred in the trailer. Even in the light most favorable to the State, all of the evidence indicated that it was an ongoing, continuous attack. Accordingly, there is substantial evidence of only one assault in the trailer. On remand, the trial court should vacate the judgment for the assault on a female (No. 16CR55325, involving the headbutt to the forehead), and enter a new sentence for the remaining consolidated offenses.

## VI.     Conclusion

¶ 36      The trial court did not err by denying defendant's motion to dismiss all but one of the assault charges because, in the light most favorable to the State, there was sufficient evidence of two assaults—one in the trailer and one in the car—to go to the

jury. The evidence was not sufficient to show two assaults in the trailer as there was no showing of a distinct interruption in what was described as a non-stop, several hour attack in the trailer. Accordingly, we modify and affirm the decision of the Court of Appeals.

MODIFIED AND AFFIRMED; REMANDED FOR RESENTENCING

Justice BERGER did not participate in the consideration or decision of this case.